**UNITED STATES, Appellee,**

v.

**Richard SOLORIO, Yeoman First Class**

**U.S. Coast Guard, Appellant.**

No. 53603.
CGCM Misc. No. 004–85.

U.S. Court of Military Appeals.

Jan. 27, 1986.

For Appellant: *Lieutenant Commander Robert Bruce* (argued).

For Appellee: *Lieutenant Commander Thomas J. Donlon* (argued).

## Opinion of the Court

EVERETT, Chief Judge:

Yeoman First Class Richard Solorio was charged under Articles 80, 128, and 134 of the Uniform Code of Military Justice, 10 U.S.C. §§ 880, 928, and 934, respectively, with numerous sex offenses involving females under the age of 16, each of whom was the daughter of a Coast Guardsman. Fourteen specifications alleged misconduct occurring at Juneau, Alaska, between March 1982 and June 1984; and seven specifications concerned misconduct at Governors Island during the period from November 20, 1984, to January 5, 1985. In a session under Article 39(a), UCMJ, 10 U.S.C. § 839(a), prior to trial, the defense moved to dismiss all the charges and specifications concerning the alleged offenses committed in Alaska on the grounds that they were not subject to court-martial jurisdiction. *See Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971); *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). After receiving evidence and hearing argument, the military judge made findings of fact; and, based on those findings, he granted the motion to dismiss.

The Government appealed from this ruling pursuant to Article 62, UCMJ, 10 U.S.C. § 862, and the Coast Guard Court of Military Review reversed the military judge's ruling. 21 M.J. 512 (1985). In turn, Solorio petitioned this Court for review and moved for a stay in his trial, which meanwhile had been set for December 3, 1985. A hearing took place on this motion and on the petition, at which time counsel for the parties ably argued their respective contentions as to the court-martial's jurisdiction over the offenses dismissed by the military judge. We now conclude that the decision of the Court of Military Review was correct, and the Government should be allowed to proceed to trial on the specifications involving alleged misconduct at Juneau, Alaska.

## I

At trial, counsel for the parties marshaled all available evidence and presented cogent arguments in support of their respective positions; and the military judge conscientiously made findings of fact as he sought to apply the criteria relevant in determining the issue of service-connection. *See Relford v. Commandant, supra.* According to these findings, Solorio

was properly absent from his unit at the time of each ... [offense in Juneau].

—Each offense ... occurred away from any military base at the accused's residence in the civilian community.

—Each offense ... occurred in a place not under military control.

\*　　\*　　\*　　\*　　\*　　\*

[T]here was no connection between the accused's military duties and the alleged offenses.

—The victims were not service members and were not involved in military duties or military supported or sponsored activities at the time of any of the alleged offenses.

—Civilian courts are present [in Alaska] and available to adjudicate the offenses. While the State of Alaska has presently deferred prosecution in light of this proceeding, the State has not waived prosecution, nor declined to prosecute.

—Accused was not in uniform and in no way flouted military authority at the time of the alleged offenses.

—None of the alleged offenses posed a threat to any military installation .... [or] resulted in any violation of military property.

—All the alleged offenses are of the type traditionally prosecuted by civilian courts and are specifically of the type the Coast Guard has recently consented to

have civilian courts prosecute Coast Guard members for in Alaska.

\* \* \* \* \* \*

There has been no demonstrated impact of the offenses on morale, discipline, the reputation or the integrity of the Coast Guard in Juneau, the personnel assigned there, nor on military operations or missions. The impact apparent in this case, that is, on the parents and the victims themselves is no different than that which would be produced by civilian perpetrator.

\* \* \* \* \* \*

There has been no showing of diminished morale, discipline, or effectiveness within the military community in Juneau, Alaska. As to the effect of the alleged incidents toward the Coast Guard within the civilian community, there has been speculation by military personnel, but little more .... There is no evidence that these alleged offenses were known by anyone in the community to have taken place, outside of law enforcement circles. I find no adverse impact on the reputation of the Coast Guard in Juneau has resulted from these incidents .... The impact of the alleged offenses, primarily reflected in the testimony of the service member parents of the victims, is that which might be expected of the victim of any crime of a similar nature, and while that impact may manifest itself in the work situation of those members, it does not rise to the level to compel the exercise of court-martial jurisdiction in these circumstances. In this regard, I note the increased caution of the parents victims may now exercise over their children, the requirements for counseling, anxiety, and time away from work for legal proceedings. These concerns would be the same whether the status of the offender were military or civilian. There has been no impact on transfer of military personnel within the meaning of the Personnel Manual provisions which have been taken judicial notice of. There have been transfers of all involved parties without restrictions.

Among supplementary findings subsequently made by the judge were these:

4. Crime has an impact. The impact is felt on the victim and on those close to the victim. It is also reflected in the greater society of which the victim and offender are a part. Impact may be direct or indirect. In this case there is no direct impact on the service. The indirect impact that exists is not sufficient to create service connection. That indirect impact consists of servicemember-parents' preoccupation with family situation affecting the members' performance, some initial counseling and referral from persons whose position it is to take such action, and time to participate in proceedings under the U.C.M.J. Good order, discipline, morale and welfare of servicemembers have not been directly impacted. Service reputation has not been adversely affected and those attributes of service reputation in a community which have been testified about, for example, credit worthiness, job stability for spouses, members' and families' access to community activities; would not be negatively impacted if these offenses were to come to light.

\* \* \* \* \* \*

6. The offenses alleged to have occurred in Alaska are significantly remote in time and place from those alleged to have occurred in New York.

The Court of Military Review concluded that in his findings the judge had erred in several important respects. For one thing, it was error for the judge to base his assessment of impact on the Juneau command solely on the observed effect after departure of all parties.

A more relevant finding in this area would pertain to the impact of these offenses on morale and discipline at Governors Island, where the accused is now stationed and living on base. The judge made no specific findings, however, with

respect to the possible effect of the offenses on morale, good order and discipline within any command at Governors Island or on personnel under the authority and responsibility of the convening authority, Commander, Third Coast Guard District.

21 M.J. at 519. The Court of Military Review also disagreed

with the judge's conclusion that the concern of the parents in this case "would be the same whether the status of the offender were military or civilian." Such a conclusion overlooked the possible unique and distinct effect from the discovery by the fathers that a fellow Coast Guardsman may have committed violative offenses, of the nature alleged, upon their daughters and the natural expectation of the fathers that those in positions of authority and responsibility within the Coast Guard would take appropriate action to vindicate the outrage felt from such a grievous breach of faith by one shipmate towards another.

Finally, the court below disputed a finding by the military judge "that 'there has been no evidence suggesting a potential lessened interest, concern or capacity of civil courts to vindicate the military's disciplinary interest in prosecuting these offenses.'" A letter from the Office of the District Attorney in Juneau indicated that state officials would "defer" to prosecution of Solorio by the Coast Guard. The Court of Military Review concluded that "[t]here is no assurance, however, that upon reconsideration the Alaskan authorities will decide to prosecute these offenses, even if the judge's dismissal for lack of military jurisdiction is allowed to stand upon final review." *Id.* at 520.

## II

■ A military judge's factfinding power under Article 62 cannot be supersed-

ed by a Court of Military Review in an appeal under Article 62, *see United States v. Burris*, 21 M.J. 140 (C.M.A.1985). To some extent the Court of Military Review may have erred in this direction; but any such error is immaterial, because, on the basis of undisputed facts, we conclude that the offenses in Alaska were service-connected.

Admittedly, our precedents involving off-base sex offenses against civilian dependents of military personnel would point to a different conclusion. *See, e.g., United States v. McGonigal*, 19 U.S.C.M.A. 94, 41 C.M.R. 94 (1969); *United States v. Shockley*, 18 U.S.C.M.A. 610, 40 C.M.R. 322 (1969); *United States v. Henderson*, 18 U.S.C.M.A. 601, 40 C.M.R. 313 (1969). However, as we made clear in *United States v. Trottier*, 9 M.J. 337 (C.M.A.1980), which concerned off-base drug activity, some of our earlier opinions on service-connection should be reexamined in light of more recent conditions and experience.[1]

In so holding, we were not trying to rewrite the Supreme Court's opinion in *O'Callahan*. Instead, we sought to apply *O'Callahan*—as amplified by *Relford*—to conditions as they now exist. Our premise was that *O'Callahan* permitted us to consider later developments in the military community and in the society at large and to take into account any new information that might bear on service-connection. *Cf. Home Bldg & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 442–43, 54 S.Ct. 231, 241–42, 78 L.Ed. 413 (1934); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926).

One recent development in our society has been an increase in the concern for victims of crimes. *See, e.g.*, President's Task Force on Victims of Crime, Final Report (Dec. 1982); Goldstein, *Defining the Role of the Victim in Criminal Prosecution*, 52 Miss.L.J. 515 (1982). Thus, Con-

---

**1.** The doctrine of *stare decisis* should never be applied to perpetuate a view which no longer

has a sound basis. *See United States v. Jacoby*,

gress[2] and state legislatures[3] have sought to protect more fully the rights of victims; courts have attempted to make less onerous the participation of victims in criminal trials;[4] and in sentencing, judges have increasingly been willing to consider information about the psychological impact of various crimes on their victims.[5]

In the present case, the alleged victims were two young girls, each of whom was the daughter of a Coast Guardsman assigned to the same district office as Solorio. It is well-recognized that children are especially susceptible to lasting psychological harm as a result of various types of sexual offenses. Indeed, this probably is the main reason for the enactment of laws to prevent the sexual exploitation of children, see, e.g., 18 U.S.C. §§ 2251–55, and for judicial decisions upholding such laws. See, e.g., New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Not surprisingly, the child victims in this case began to receive psychological counseling after the crimes came to light.

When young children are sexually molested, parents also are in many ways victims of the crime. This seems especially true in the present case, for the parents were also receiving psychological counseling. Moreover, these parents were victimized financially, for they would have the legal responsibility to pay for any necessary medical and psychiatric treatment for their daughters—except to the extent that, as military dependents, the victims were entitled to medical care at government expense.

■ The military judge found that "[t]he impact ... on the parents" was "no different than that which would be produced by [a] civilian perpretrator." The Court of Military Review questioned this conclusion because it "overlooked the possible unique and distinct effect from the discovery by the fathers that a fellow Coast Guardsman may have committed violative offenses, of the nature alleged, upon their daughters." 21 M.J. at 520. However, even if the judge's finding was correct, it is not decisive as to court-martial jurisdiction. The lack of in personam jurisdiction over a civilian who commits a crime having great impact on service personnel does not mean that there would be no court-martial jurisdiction over the same crime if committed by a servicemember.

O'Callahan's primary concern is with the impact of crimes on the armed services and their missions. Unless there is such impact, no reason exists not to allow a servicemember the right to a jury trial and grand-jury indictment which he generally would enjoy if tried in a civilian court. In seeking to demonstrate impact, the Government offered evidence that, because of the trauma resulting from learning of the offenses against their daughters, the fathers could not function as effectively in their Coast Guard duty assignments as they had previously.

Of course, prior to discovery of the offenses, Solorio had been transferred from Alaska and was no longer serving with them. However, if this had not occurred, it obviously would have been difficult—if not impossible—for the victims' fathers to continue to serve in the District Office with

11 U.S.C.M.A. 428, 430, 29 C.M.R. 244, 246 (1960).

2. See, e.g., the Victim and Witness Protection Act, Pub.L. No. 97–291, 96 Stat. 1248 (codified at 18 U.S.C. § 1501 note, 1503, 1505, 1510, 1512 note, 1512–1515, 3146, 3579 note, 3580, Fed.R. Crim.P. 32(c)(2) (1982); Goldstein, The Victim and Prosecutorial Discretion: The Federal Victim and Witness Protection Act of 1982, 47 Law & Contemp.Probs. 225 (1984).

3. Gittler, Expanding the Role of the Victim in a Criminal Action: An Overview of Issues and

Problems, 11 Pepperdine L.Rev. 117 (Symposium issue 1984).

4. See, e.g., Morris v. Slappy, 461 U.S. 1, 14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610 (1983); Fed.R. Evid. 412 (rape shield).

5. United States v. Hammond, 17 M.J. 218 (C.M. A.1984); United States v. Marshall, 14 M.J. 157 (C.M.A.1982). See also Victim and Witness Protection Act, supra, § 3, 96 Stat. 1249; Fed.R. Crim.P. 32(c)(2).

him. Indeed, it is unlikely that Solorio and the two fathers could ever again be satisfactorily assigned together in one of the small units which is typical of the Coast Guard organization. Furthermore, because of the widespread hostility towards the offender that usually results from this type of sex offense, it would appear that Solorio's future assignments would be greatly limited due to the tensions that his presence would create in an organization.

■ Obviously, not every off-base offense against a servicemember's dependent is service-connected. For example, an off-post larceny from a dependent usually would not have the continuing effects which would cause it to be classified as service-connected. However, sex offenses against young children—offenses like those alleged in the charges against Solorio— have a continuing effect on the victims and their families and ultimately on the morale of any military unit or organization to which the family member is assigned. This continuing effect tends to establish service-connection.

In *O'Callahan*, the Supreme Court ruled that, despite a servicemember's military status, he could not be tried by a court-martial for offenses that were not service-connected. This result was based on the premise that such offenses were not within the legislative power "[t]o make rules for the Government and Regulation of the land and naval Forces." *See* U.S. Const. art. I, § 8, cl. 14. It would seem to be a necessary corollary that Congress could not prohibit conduct that lacked service-connection, even if violations of the prohibition were to be tried in Federal District Court, where every constitutional safeguard clearly would be available to defendants.

On this premise, the determination of service-connection should be made only in light of the conditions existing when the alleged misconduct occurred, because, un-less service-connection existed at that time, the conduct falls outside Congress' power to punish and no crime has been committed. Accordingly, events which occurred after commission of an alleged offense would be immaterial to the issue of jurisdiction. This means that, for example, in determining service-connection of a servicemember's off-post crime, only the likelihood and feasibility of civilian prosecution at the time of the crime could be considered—even if the crime were not discovered for some time after its occurrence; and subsequent changes in State law and policy which might increase or decrease that likelihood would be disregarded.

However, it appears to us that the emphasis in *O'Callahan* was not on the scope of substantive congressional power to regulate a servicemember's off-duty, off-post conduct,[6] but instead was on assuring that, as far as feasible, servicemembers would retain their constitutional right to grand-jury indictment and trial by petit jury. Thus, in *Gosa v. Mayden*, 413 U.S. 665, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973), the Court declined to apply *O'Callahan* retroactively, even though it appears somewhat anomalous to sustain convictions for violating rules which Congress had no power to prescribe.

If factors such as the probability of trial in a civilian court are relevant in determining service-connection, then we should consider whether as a practical matter there is any likelihood that, if the charges are dismissed, Solorio will be prosecuted in an Alaskan court. The letter from the District Attorney's Office, which indicated that the State would defer prosecution in favor of a military trial, was given little weight by the military judge. Even though the Court of Military Review criticized him in this regard, we also would not attach great significance to such a document. Otherwise, military authorities anxious to try a servicemember by court-martial might en-

---

**6.** It would seem that some acts on the part of servicemembers cannot be prohibited by Congress, no matter what might be the method for trying and punishing violations of the prohibition. *Cf. United States v. Nation,* 9 U.S.C.M.A. 724, 26 C.M.R. 504 (1958); *United States v. Wysong,* 9 U.S.C.M.A. 249, 26 C.M.R. 29 (1958); *United States v. Milldebrandt,* 8 U.S.C.M.A. 635, 25 C.M.R. 139 (1958).

deavor to persuade civilian prosecutors to drop cases that they normally would prosecute, in an effort to create court-martial jurisdiction that otherwise would not exist.

 On the other hand, we recognize that in cases like this, where the prospective defendant and the victims have left the State and moved to distant locations—Solorio to Governors Island; one of the victims and her father to the Washington, D.C. area; and the other to Maryland—State officials are less likely to be interested in prosecuting. Moreover, if for some reason, the victims decide that they do not wish to go back to Alaska and undergo the trauma of testifying, it will be difficult to compel their attendance. Therefore, because Solorio's transfer to Governors Island was a routine matter and in no way undertaken with a view to creating court-martial jurisdiction, we conclude that it is appropriate to consider the situation as it now exists and not merely as it existed at Juneau when the crimes were committed but before they were discovered.

The same observation applies with respect to the commission of subsequent offenses at Governors Island. If service-connection must be determined solely in terms of events as they existed at the time of an alleged offense, then we could not take into account other offenses committed some months later. However, as we have indicated, *O'Callahan*—despite its reliance on Article I, section 8, cl. 14 of the Constitution—does not require that service-connection be evaluated in such a limited context. Accordingly, the pendency of the subsequent offenses for trial by general court-martial is relevant in determining service-connection.

In *United States v. Lockwood*, 15 M.J. 1 (C.M.A.1983), we declined to apply the doctrine of "pendent jurisdiction" in deciding whether a court-martial was entitled to try certain offenses. Nonetheless, we observed that some of the factors which underlie that doctrine also tend to establish service-connection. We noted the advantages in having all charges disposed of in a single proceeding and commented:

The Government has an interest in assuring that a servicemember receives an appropriate punishment for his crimes and that, if feasible, he is rehabilitated. When the responsibility for punishing a course of criminal conduct is divided between civilian and military authorities, these goals may be hindered. For one thing, the servicemember is subjected to two convictions rather than one and this may carry adverse collateral consequences which make it more difficult for the accused to be rehabilitated. Since two trials must take place, rather than only one, the accused may undergo two ordeals and remain uncertain about his fate until the second trial is concluded. Commencing a successful rehabilitation program is more difficult until it becomes certain what the accused's punishment ultimately will be; so the commencement of successful rehabilitation may be delayed while awaiting the results of a second trial. Also, the military sentencing and correctional authorities may differ from their civilian counterparts in methodology and in goals; and these differences may complicate the rehabilitation process.

Further, we remarked:

The "practical reasons of dispatch" which have led to the military practice of joining all known offenses in a single trial also help support the conclusion that where related on-base and off-base offenses are involved, there is a military interest in having all the offenses tried by court-martial, so that they can be disposed of together without delay. The existence of this interest, in turn, helps provide a basis for finding service connection for the off-base offenses.

*Id.* at 8.

Admittedly, in the present case, the offenses in Juneau are not "related" in time or place to those at Governors Island. On the other hand, they are of a similar type and probably result from the same underlying motive or predisposition. Indeed, the similarity is such that, even if not before the court-martial for trial, the offenses in

Alaska might be admissible under Mil.R. Evid. 404(b); and apparently, if the military judge's ruling is upheld, the Government will seek to use evidence of these offenses pursuant to that rule. Moreover, the method of rehabilitation employed would seem to be the same for the Alaska and the Governors Island offenses; and the likelihood of successful rehabilitation for the latter offenses would be small if the others were still pending for trial. From the standpoint of the two girls and their parents, there also is the advantage that the trial by court-martial at Governors Island will promptly dispose of the offenses allegedly committed in Alaska and will eliminate the possibility that on two occasions, rather than one, the victims will have to give "public testimony about a humiliating and degrading experience such as was involved here." *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). Under these circumstances, there exists here "a military interest in having all the offenses tried by court-martial, so that they can be disposed of together without delay," and "this interest, in turn, helps provide a basis for finding service connection for the off-base offenses."

When we consider the continuing effects of appellant's off-base misconduct on the servicemember fathers of the two victims, the resulting effect on other Coast Guardsmen and on that service, the unfeasibility of an Alaskan prosecution, and the importance to the Coast Guard of disposing of all the offenses promptly in a single trial, we are convinced that service-connection exists and that the court below correctly reversed the military judge.

### III

The petition for grant of review is granted. The motion for a stay is denied, and the motion to strike the affidavits is dismissed as moot.

The decision of the United States Coast Guard Court of Military Review is affirmed.

Judge COX concurs.