UNITED STATES

v.

Sergeant Domingo AVILA, FR 533–56–5291, United States Air Force.

ACM 25577.

U.S. Air Force Court of Military Review.

Sentence Adjudged 9 May 1986.

Decided 3 March 1987.

Appellate Counsel for the Appellant: Colonel Leo L. Sergi and Major Deborah A. Baker.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Major Kathryn I. Taylor.

Before HODGSON, STEWART, HOLTE, FORAY, MICHALSKI, LEWIS, SESSOMS and MURDOCK, En Banc, Appellate Military Judges.

DECISION

SESSOMS, Senior Judge:

The accused was convicted, despite his pleas, of having committed an act of sodomy with his four year old stepdaughter at their off-base residence in Tacoma, Washington. The sentence imposed by the members included a dishonorable discharge, confinement for 10 years, reduction to pay grade E–1, and the forfeiture of $319 per month for 10 years. The convening authority reduced the confinement and forfeiture period to seven years.

Appellate defense counsel have assigned as error (1) the failure of the military judge to grant a motion to dismiss for lack of subject matter jurisdiction, and (2) the admission into evidence of the hearsay testimony of a clinical psychologist regarding her interview with the victim. The testimony of the psychologist was determined by the trial judge to be admissible under Mil. R.Evid. 803(4) as a statement which had been taken for the purpose of medical diagnosis or treatment. Because of our disposition of the jurisdictional question we do not reach the latter issue.

The salient facts which form the basis for the jurisdictional dispute are not complicated. The wife of the appellant, Deborah, had formerly served on active duty as a member of the Air Force. On 3 April 1981,

and while she was attending technical school at Sheppard AFB, Texas, she married one Michael Pollock, also an Air Force member. Within six months of the marriage Deborah gave birth to her daughter, Diana, the victim in this case. Diana has been known as Diana Pollock since birth.

Deborah and Michael Pollock lived together as husband and wife until October 1982; first in Texas, and later in the Philippines where they had been posted on a joint assignment. In an action instituted by Deborah, they were subsequently granted a divorce by a Texas court, the jurisdiction in which they were married. The decree, which was issued on 27 March 1984, provided, *inter alia*, that Michael was not Diana's biological father, and made no provision for her support. On 9 June 1984, while they were still in the Philippines, Deborah married the appellant, Sergeant Avila. She had apparently begun seeing him sometime during the previous fall.

After her return to the United States Deborah was discharged from the service because of an injury she had received in the course of her duties as a refrigeration specialist. Pollock's assignment upon his return was to Buckley Field, Colorado. He was later moved to Tyndall AFB, Florida, his duty station at the time of the trial. The appellant returned from the Philippines to McChord AFB, Washington. Deborah and her daughter joined him there on 12 April 1985. The offense occurred sometime between that date and 15 January 1986.

Before denying the motion to dismiss the trial judge made detailed findings of fact regarding subject matter jurisdiction. These findings dealt with, among other things, the geography and demography of the area surrounding McChord Air Force Base, including the fact that the family residence was 3½ miles from the base. He also made findings concerning the possible effect the allegations had on the accused, Sergeant Pollock, the military mission of McChord, the impact on the morale of the accused's unit, and a wide variety of other factors which he considered to be relevant.

Perhaps the most significant finding of the trial judge on the issue of subject matter jurisdiction is the one pertaining to the relationship of Sergeant Pollock to the victim. He concluded that under the laws of the State of Washington, Pollock was presumed to be the victim's legal father because he was married to her mother at the time of her birth. As a result of this rebuttable presumption, Sergeant Pollock is a necessary party to any custody dispute that might arise in a Washington court. Apparently, it was upon this basis that the military judge concluded, and so judicially found, that Pollock was the child's legal father. We have great difficulty in understanding his rationale in reaching this conclusion, particularly in view of the fact that he also judicially determined that the child had been conceived before Deborah and Michael became acquainted. He was also aware of the particulars of the Texas divorce decree. It seems obvious to us that under these circumstances this rebuttable presumption of parenthood would be summarily overcome if this issue were submitted for adjudication to any court of competent jurisdiction.

The Court of Military Appeals has held that, when other salient factors are present, there is a service-connection sufficient to bestow upon military courts subject matter jurisdiction of off-base sex offenses perpetrated by military members against the dependent daughters of fellow service members because of the continuing effects of the misconduct on the fathers of the victims. *United States v. Abell*, 23 M.J. 99, (C.M.A.1986); *United States v. Solorio*, 21 M.J. 251, (C.M.A.1986), *cert. granted*, — U.S. ——, 106 S.Ct. 2914, 91 L.Ed.2d 543 (1986). Although many of the factors relied upon by our superior court in determining the existence of service-connection in the cases cited above are also present in this case, we believe that the tenuous relationship of Sergeant Pollock to the victim of this crime is considerably less than that of parenthood, and certainly is not sufficient to bring this case within the parameters of *Solorio*, and *Abell*, both *su-*

*pra.* If the misconduct of this appellant had any perceivable effect on Sergeant Pollock, it seemed to manifest itself in the concern that he might somehow be required to become responsible for child support in the future. This is hardly the effect on the fathers of victims that the Court of Military Appeals was contemplating when deciding *Solorio* and *Abell.* We are convinced that there are no factors present in this case that are sufficiently significant to distinguish it from *United States v. Bolser,* 22 M.J. 564, (A.F.C.M.R. 1986), or *United States v. Dale,* 23 M.J. 598, (A.F.C.M.R.1986). We therefore find, as we did in those cases, that the trial court was without subject matter jurisdiction over the alleged offenses and that the military judge erred in denying the motion to dismiss.

The findings and sentence are hereby set aside and the charges are

### DISMISSED.

Senior Judge FORAY and Judges STEWART, MICHALSKI, and MURDOCK concur.

HODGSON, Chief Judge, with whom HOLTE, Judge, joins (dissenting):

I dissent. See my dissenting statement in *United States v. Dale,* 23 M.J. 598, 600 (A.F.C.M.R.1986): Certificate for Review Filed, 23 M.J. 243 (C.M.A.1986).

LEWIS, Judge (dissenting):

I would find subject matter jurisdiction. The instant case is not a mirror image of *Bolser, Dale,* or, more recently, *United States v. Barber,* 23 M.J. 751, (A.F.C.M.R. 1987), in one critical aspect. The impact of the offense of which the appellant stands convicted extended in a tangible manner beyond his immediate household into a small, but identifiable, portion of the Air Force in the person of Sergeant Michael J. Pollock.

Sergeant Pollock was stationed at Tyndall Air Force Base, Florida, far removed from the situs of the offense. He was present at trial solely to support the prosecution's claim of jurisdiction, not because he could provide testimony relevant to the merits. Although he had been absolved both of child support obligations and the presumption of paternity by a Texas divorce decree, he did have a viable claim of "fatherhood" with respect to the victim. He was present as head of the household in the victim's home during the first year of her life. During this time he held a position *in loco parentis* to the victim. She bore his name both then and, subsequently, at the time of the offense and resulting trial. His concern, as expressed at trial, might well be characterized as more that of a potential source of child support payments than as an aggrieved parent. However, it is surely unwise to attempt to predicate jurisdictional determinations upon how an affected service member, drawn into the vortex of a criminal offense committed by another member, happens to react. The fact that the offense did clearly and inevitably enmesh Sergeant Pollock in its legal and socio-economic consequences owing to his past familial relationship with the victim is sufficient, in my view, to establish service-connection.

My view of subject matter jurisdiction in this case represents a minority of one on this court as matters now stand. I would not be inclined to extend my view of service-connection in this case to situations in which service members with no past or present familial relationship to the victim of such an offense become emotionally or otherwise embroiled in the consequences of the offense. In other words, I believe that our past pronouncements in *Bolser* and *Dale* remain fundamentally sound.

The military judge is to be commended for his thorough and thoughtful treatment of this issue. However, in his findings and conclusions he has placed undue reliance upon highly subjective, judgmental principles which are more susceptible to stoking irresolvable debate than to defining the limits of service-connection, particularly in this most troublesome area. Examples of three such propositions advanced and discussed by the military judge are: (1) the offense is "repugnant and unconscionable"

and is likely to create great concern in the military community; (2) the reputation of the military unit as a whole suffers when offenses of this nature become known in the civilian community; and, (3) cases involving child sexual abuse can best be viewed from a "national perspective," a perspective for which the Air Force is, by implication, better equipped than a given local jurisdiction.

The heinous nature of an offense, coupled with a resulting community sense of outrage, is not a very satisfactory gauge for determining jurisdiction. Few would argue that the breaking and entering of a secured hotel room followed by the assault and attempted rape of a young lady residing therein is less than heinous. *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). Where two communities are concerned, as in *O'Callahan* and the case before us, can we readily determine which of the two is visited by the greatest degree of public outrage? Is intensity of public outrage, if it can be measured, a reliable basis for selection of a trial forum? While I am pushing this particular approach to jurisdiction to its illogical extremity, I do so with the thought that this is the invariable direction in which this approach leads.

The adverse impact on the reputation of the military unit and service resulting from crimes committed by military members within a civilian community is a factor that may legitimately be considered in conjunction with other factors bearing on jurisdiction. *United States v. Abell*, 23 M.J. 99 (C.M.A.1986); *United States v. Scott*, 21 M.J. 345 (C.M.A.1986); *United States v. Lockwood*, 15 M.J. 1 (C.M.A.1983). However, it is clear enough that this subjective factor was not dispositive of the service-connection issue in these cases. Service-connection should be made of sterner stuff. While such a factor certainly assists in bolstering a claim of jurisdiction grounded on more tangible factors, it helps little standing alone or as viewed in the context of other subjective factors. If military commanders are embarrassed by the unwelcome notoriety of an offense committed by a member in the local community, the reaction is both understandable and appropriate. The member's military service should be, and in most instances will be, terminated in due course. *See United States v. Barber, supra.* However, subject matter jurisdiction which purports to be, in any large measure, premised on command embarrassment suffers the same inevitable infirmity of that which is premised on the degree of community outrage.

Can a military court-martial provide a "national perspective" on the perplexing and tragic phenomenon of child sexual abuse that is likely to be lacking in a local forum? This is undoubtedly a question without answer, or, alternatively, a question with too many discordant answers, at the present time. If such a perspective existed in this case it manifested itself, in part, in the form of ten years of confinement, subsequently reduced to seven years of confinement, for one proved act of sodomy with a child. I would suggest that many observers might well argue with the contention that this type of judicial response represents the best product of our national collective wisdom on this matter.

As my fellow judges, I address the issue of service-connection only. Other matters which might otherwise be dispositive need not be reached in view of the majority's holding that the court-martial lacked subject matter jurisdiction.