# SOLORIO v. UNITED STATES

No. 85–1581.   Argued February 24, 1987—Decided June 25, 1987

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, POWELL, O'CONNOR, and SCALIA, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 451. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, and in all but the last paragraph of which BLACKMUN, J., joined, *post*, p. 452.

*Robert W. Bruce, Jr.*, argued the cause and filed briefs for petitioner.

*Eugene R. Fidell* argued the cause for the American Civil Liberties Union as *amicus curiae* urging reversal. With him on the brief were *George Kannar, Burt Neuborne, Arthur B. Spitzer*, and *Keith M. Harrison*.

*Solicitor General Fried* argued the cause for the United States. With him on the brief were *Assistant Attorney General Weld, Deputy Solicitor General Bryson, Paul J. Larkin, Jr., John F. De Pue*, and *Thomas J. Donlon*.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case presents the question whether the jurisdiction of a court-martial convened pursuant to the Uniform Code of Military Justice (U. C. M. J.) to try a member of the Armed Forces depends on the "service connection" of the offense charged. We hold that it does not, and overrule our earlier decision in *O'Callahan* v. *Parker*, 395 U. S. 258 (1969).

While petitioner Richard Solorio was on active duty in the Seventeenth Coast Guard District in Juneau, Alaska, he sexually abused two young daughters of fellow coastguardsmen.

---

*Briefs of *amici curiae* urging reversal were filed for the Defense Appellate Division, United States Army, by *Brooks B. La Grua;* and for Vietnam Veterans of America by *Ronald William Meister* and *Barton F. Stichman.*

*David C. Larson* filed a brief for the Appellate Defense Division, United States Navy-Marine Corps Appellate Review Activity, as *amicus curiae.*

Petitioner engaged in this abuse over a 2-year period until he was transferred by the Coast Guard to Governors Island, New York. Coast Guard authorities learned of the Alaska crimes only after petitioner's transfer, and investigation revealed that he had later committed similar sexual abuse offenses while stationed in New York. The Governors Island commander convened a general court-martial to try petitioner for crimes alleged to have occurred in Alaska and New York.

There is no "base" or "post" where Coast Guard personnel live and work in Juneau. Consequently, nearly all Coast Guard military personnel reside in the civilian community. Petitioner's Alaska offenses were committed in his privately owned home, and the fathers of the 10- to 12-year-old victims in Alaska were active duty members of the Coast Guard assigned to the same command as petitioner. Petitioner's New York offenses also involved daughters of fellow coastguardsmen, but were committed in Government quarters on the Governors Island base.

After the general court-martial was convened in New York, petitioner moved to dismiss the charges for crimes committed in Alaska on the ground that the court lacked jurisdiction under this Court's decisions in *O'Callahan* v. *Parker, supra,* and *Relford* v. *Commandant, U. S. Disciplinary Barracks,* 401 U. S. 355 (1971).[1] Ruling that the Alaska offenses were not sufficiently "service connected" to be tried in the military criminal justice system, the court-martial judge granted the motion to dismiss. The Government appealed the dismissal of the charges to the United

---

[1] Petitioner was charged with 14 specifications alleging indecent liberties, lascivious acts, and indecent assault in violation of U. C. M. J., Art. 134, 10 U. S. C. § 934, 6 specifications alleging assault in violation of Art. 128, 10 U. S. C. § 928, and 1 specification alleging attempted rape in violation of Art. 80, 10 U. S. C. § 880. The specifications alleged to have occurred in Alaska included all of the Article 128 and Article 80 specifications and 7 of the Article 134 specifications.

States Coast Guard Court of Military Review, which reversed the trial judge's order and reinstated the charges. 21 M. J. 512 (1985).

The United States Court of Military Appeals affirmed the Court of Military Review, concluding that the Alaska offenses were service connected within the meaning of *O'Callahan* and *Relford.* 21 M. J. 251 (1986). Stating that "not every off-base offense against a servicemember's dependent is service-connected," the court reasoned that "sex offenses against young children . . . have a continuing effect on the victims and their families and ultimately on the morale of any military unit or organization to which the family member is assigned." *Id.,* at 256. In reaching its holding, the court also weighed a number of other factors, including: the interest of Alaska civilian officials in prosecuting petitioner; the hardship on the victims, who had moved from Alaska, that would result if they were called to testify both at a civilian trial in Alaska and at the military proceeding in New York; and the benefits to petitioner and the Coast Guard from trying the Alaska and New York offenses together.[2] This Court subsequently granted certiorari pursuant to 28 U. S. C. § 1259(3) (1982 ed., Supp. III) to review the decision of the Court of Military Appeals. 476 U. S. 1181 (1986). We now affirm.

The Constitution grants to Congress the power "[t]o make Rules for the Government and Regulation of the land and naval Forces." U. S. Const., Art. I, § 8, cl. 14. Exercising this authority, Congress has empowered courts-martial to try servicemen for the crimes proscribed by the U. C. M. J.,

---

[2] Following the decision of the Court of Military Appeals, petitioner unsuccessfully sought a stay from that court and from Chief Justice Burger. The court-martial reconvened and petitioner was convicted of 8 of the 14 specifications alleging offenses committed in Alaska and 4 of the 7 specifications alleging offenses committed in New York. These convictions are currently under review by the convening authority pursuant to U. C. M. J., Art. 60, 10 U. S. C. § 860.

Arts. 2, 17, 10 U. S. C. §§ 802, 817. The Alaska offenses with which petitioner was charged are each described in the U. C. M. J. See n. 1, *supra.* Thus it is not disputed that the court-martial convened in New York possessed the statutory authority to try petitioner on the Alaska child abuse specifications.

In an unbroken line of decisions from 1866 to 1960, this Court interpreted the Constitution as conditioning the proper exercise of court-martial jurisdiction over an offense on one factor: the military status of the accused. *Gosa* v. *Mayden*, 413 U. S. 665, 673 (1973) (plurality opinion); see *Kinsella* v. *United States ex rel. Singleton*, 361 U. S. 234, 240–241, 243 (1960); *Reid* v. *Covert*, 354 U. S. 1, 22–23 (1957) (plurality opinion); *Grafton* v. *United States*, 206 U. S. 333, 348 (1907); *Johnson* v. *Sayre*, 158 U. S. 109, 114 (1895); *Smith* v. *Whitney*, 116 U. S. 167, 183–185 (1886); *Coleman* v. *Tennessee*, 97 U. S. 509, 513–514 (1879); *Ex parte Milligan*, 4 Wall. 2, 123 (1866); cf. *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11, 15 (1955); *Kahn* v. *Anderson*, 255 U. S. 1, 6–9 (1921); *Givens* v. *Zerbst*, 255 U. S. 11, 20–21 (1921). This view was premised on what the Court described as the "natural meaning" of Art. I, § 8, cl. 14, as well as the Fifth Amendment's exception for "cases arising in the land or naval forces." *Reid* v. *Covert, supra,* at 19; *United States ex rel. Toth* v. *Quarles, supra,* at 15. As explained in *Kinsella* v. *Singleton, supra:*

> "The test for jurisdiction . . . is one of *status*, namely, whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term 'land and naval Forces.' . . ." *Id.,* at 240–241 (emphasis in original).

> "Without contradiction, the materials . . . show that military jurisdiction has always been based on the 'status' of the accused, rather than on the nature of the offense. To say that military jurisdiction 'defies definition in terms of military "status"' is to defy the unambiguous

language of Art. I, § 8, cl. 14, as well as the historical background thereof and the precedents with reference thereto." *Id.*, at 243.

Implicit in the military status test was the principle that determinations concerning the scope of court-martial jurisdiction over offenses committed by servicemen was a matter reserved for Congress:

> "[T]he rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress." *Burns* v. *Wilson,* 346 U. S. 137, 140 (1953) (plurality opinion) (footnote omitted).

See also *Coleman* v. *Tennessee, supra,* at 514; Warren, The Bill of Rights and the Military, 37 N. Y. U. L. Rev. 181, 187 (1962).[3]

In 1969, the Court in *O'Callahan* v. *Parker* departed from the military status test and announced the "new constitutional principle" that a military tribunal may not try a serviceman charged with a crime that has no service connection. See *Gosa* v. *Mayden, supra,* at 673. Applying this principle, the *O'Callahan* Court held that a serviceman's off-base sexual assault on a civilian with no connection with the military could not be tried by court-martial. On reexamination of

---

[3] One pre-1969 decision of this Court suggests that the constitutional power of Congress to authorize trial by court-martial must be limited to "the least possible power adequate to the end proposed." *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 23 (1955) (emphasis deleted). Broadly read, this dictum applies to determinations concerning Congress' authority over the courts-martial of servicemen for crimes committed while they were servicemen. Yet the Court in *Toth* v. *Quarles* was addressing only the question whether an ex-serviceman may be tried by court-martial for crimes committed while serving in the Air Force. Thus, the dictum may be also interpreted as limited to that context.

*O'Callahan,* we have decided that the service connection test announced in that decision should be abandoned.

The constitutional grant of power to Congress to regulate the Armed Forces, Art. I, § 8, cl. 14, appears in the same section as do the provisions granting Congress authority, *inter alia,* to regulate commerce among the several States, to coin money, and to declare war. On its face there is no indication that the grant of power in Clause 14 was any less plenary than the grants of other authority to Congress in the same section. Whatever doubts there might be about the extent of Congress' power under Clause 14 to make rules for the "Government and Regulation of the land and naval Forces," that power surely embraces the authority to regulate the conduct of persons who are actually members of the Armed Services. As noted by Justice Harlan in his *O'Callahan* dissent, there is no evidence in the debates over the adoption of the Constitution that the Framers intended the language of Clause 14 to be accorded anything other than its plain meaning.[4] Alexander Hamilton described these powers of Congress "essential to the common defense" as follows:

> "These powers ought to exist without limitation, because it is impossible to foresee or define the extent and variety of national exigencies, or the correspondent extent and variety of the means which may be necessary to satisfy them. . . .
>
> .        .        .        .        .
>
> ". . . Are fleets and armies and revenues necessary for this purpose [common safety]? The government of the Union must be empowered to pass all laws, and to make all regulations which have relation to them." The Federalist No. 23, pp. 152–154 (E. Bourne ed. 1947).

---

[4] See *O'Callahan,* 395 U. S., at 277 (Harlan, J., dissenting); 2 M. Farrand, The Records of the Federal Convention of 1787, pp. 329–330 (1911); 5 J. Elliot, Debates on the Federal Constitution 443, 545 (1876).

The *O'Callahan* Court's historical foundation for its holding rests on the view that "[b]oth in England prior to the American Revolution and in our own national history military trial of soldiers committing civilian offenses has been viewed with suspicion." 395 U. S., at 268. According to the Court, the historical evidence demonstrates that, during the late 17th and 18th centuries in England as well as the early years of this country, courts-martial did not have authority to try soldiers for civilian offenses. The Court began with a review of the 17th-century struggle in England between Parliament and the Crown over control of the scope of court-martial jurisdiction. As stated by the Court, this conflict was resolved when William and Mary accepted the Bill of Rights in 1689, which granted Parliament exclusive authority to define the jurisdiction of military tribunals. See *ibid.* The Court correctly observed that Parliament, wary of abuses of military power, exercised its new authority sparingly.[5] Indeed, a statute enacted by Parliament in 1689 provided for court-martial only for the crimes of sedition, mutiny, and desertion, and exempted members of militia from its scope. Mutiny Act of 1689, 1 Wm. & Mary, ch. 5.

The *O'Callahan* Court's representation of English history following the Mutiny Act of 1689, however, is less than accurate. In particular, the Court posited that "[i]t was . . . the rule in Britain at the time of the American Revolution that a soldier could not be tried for a civilian offense committed in Britain; instead military officers were required to use their energies and office to insure that the accused soldier would be tried before a civil court." 395 U. S., at 269. In making this statement, the Court was apparently referring to Section

---

[5] See, *e. g.*, 1 W. Winthrop, Military Law and Precedents 8–9 (2d ed. 1896) (hereinafter Winthrop); G. Nelson & J. Westbrook, Court-Martial Jurisdiction Over Servicemen for "Civilian" Offenses: An Analysis of O'Callahan v. Parker, 54 Minn. L. Rev. 1, 7–11 (1969) (hereinafter Nelson & Westbrook).

XI, Article I, of the British Articles of War in effect at the time of the Revolution.[6] This Article provided:

> "Whenever any Officer or Soldier shall be accused of a Capital Crime, or of having used Violence, or committed any Offence against the Persons or Property of Our Subjects, . . . the Commanding Officer, and Officers of every Regiment, Troop, or Party to which the . . . accused shall belong, are hereby required, upon Application duly made by, or in behalf of the Party or Parties injured, to use . . . utmost Endeavors to deliver over such accused . . . to the Civil Magistrate." British Articles of War of 1774, reprinted in G. Davis, Military Law of the United States 581, 589 (3d rev. ed. 1915).

This provision, however, is not the sole statement in the Articles bearing on court-martial jurisdiction over civilian offenses. Specifically, Section XIV, Article XVI, provided that all officers and soldiers who

> "shall maliciously destroy any Property whatsoever belonging to any of Our Subjects, unless by Order of the then Commander in Chief of Our Forces, to annoy Rebels or other Enemies in Arms against Us, he or they that shall be found guilty of offending herein shall (besides such Penalties as they are liable to by law) be punished according to the Nature and Degree of the Offence, by the Judgment of a Regimental or General Court Martial." *Id.*, at 593.

Under this provision, military tribunals had jurisdiction over offenses punishable under civil law. Nelson & Westbrook

---

[6] There is some confusion among historians and legal scholars about which version of the British Articles of War was "in effect" at the time of the American Revolution. Some cite to the Articles of War of 1765 and others to the Articles of War of 1774. Compare, *e. g.*, 2 Winthrop 1448, with J. Horbaly, Court-Martial Jurisdiction 34 (1986) (unpublished dissertation, Yale Law School) (hereinafter Horbaly). For present purposes, however, the two versions of the Articles contain only stylistic differences. In the interest of simplicity, we will refer to the 1774 Articles.

11. Accordingly, the *O'Callahan* Court erred in suggesting that, at the time of the American Revolution, military tribunals in England were available "only where ordinary civil courts were unavailable." 395 U. S., at 269, and n. 11.

The history of early American practice furnishes even less support to *O'Callahan*'s historical thesis. The American Articles of War of 1776, which were based on the British Articles, contained a provision similar to Section XI, Article I, of the British Articles, requiring commanding officers to deliver over to civil magistrates any officer or soldier accused of "a capital crime, . . . having used violence, or . . . any offence against the persons or property of the good people of any of the United American States" upon application by or on behalf of an injured party. American Articles of War of 1776, Section X, Article I, reprinted in 2 Winthrop 1494. It has been postulated that American courts-martial had jurisdiction over the crimes described in this provision where no application for a civilian trial was made by or on behalf of the injured civilian.[7] Indeed, American military records reflect trials by court-martial during the late 18th century for offenses against civilians and punishable under civil law, such as theft and assault.[8]

The authority to try soldiers for civilian crimes may be found in the much-disputed "general article" of the 1776 Articles of War, which allowed court-martial jurisdiction over "[a]ll crimes not capital, and all disorders and neglects which officers and soldiers may be guilty of, to the prejudice of good order and military discipline." American Articles of War of 1776, Section XVIII, Article 5, reprinted in 2 Winthrop 1503.

---

[7] See Nelson & Westbrook 14; cf. Duke & Vogel, The Constitution and the Standing Army: Another Problem of Court-Martial Jurisdiction, 13 Vand. L. Rev. 435, 445–446 (1960) (hereinafter Duke & Vogel).

[8] See *O'Callahan*, 395 U. S., at 278, n. 3 (Harlan, J., dissenting); see also J. Bishop, Justice under Fire 81–82 (1974); Nelson & Westbrook 15; Comment, *O'Callahan* and Its Progeny: A Survey of Their Impact on the Jurisdiction of Courts-Martial, 15 Vill. L. Rev. 712, 719, n. 38 (1970) (hereinafter Comment).

Some authorities, such as those cited by the *O'Callahan* Court, interpreted this language as limiting court-martial jurisdiction to crimes that had a direct impact on military discipline.[9] Several others, however, have interpreted the language as encompassing all noncapital crimes proscribed by the civil law.[10] Even W. Winthrop, the authority relied on most extensively by the majority in *O'Callahan*, recognized that military authorities read the general article to include crimes "committed upon or against *civilians* . . . at or near a military camp or post." 2 Winthrop 1124, 1126, n. 1.

We think the history of court-martial jurisdiction in England and in this country during the 17th and 18th centuries is far too ambiguous to justify the restriction on the plain language of Clause 14 which *O'Callahan* imported into it.[11]

---

[9] See 2 Winthrop 1123; Duke & Vogel 446–447.

[10] See, *e. g.*, *Grafton* v. *United States*, 206 U. S. 333, 348 (1907); Hearings before the Senate Committee on Military Affairs, Appendix to S. Rep. No. 130, 64th Cong., 1st Sess., 91 (statement of Brig. Gen. Enoch Crowder).

George Washington also seems to have held this view. When informed of the decision of a military court that a complaint by a civilian against a member of the military should be redressed only in a civilian court, he stated in a General Order dated February 24, 1779:

"All improper treatment of an inhabitant by an officer or soldier being destructive of good order and discipline as well as subversive of the rights of society is as much a breach of military, as civil law and as punishable by the one as the other." 14 Writings of George Washington 140–141 (J. Fitzpatrick ed. 1936).

[11] The history of court-martial jurisdiction after the adoption of the Constitution also provides little support for *O'Callahan*. For example, in 1800, Congress enacted Articles for the Better Government of the Navy, which provided that "[a]ll offences committed by persons belonging to the navy while on the shore, shall be punished in the same manner as if they had been committed at sea." Act of Apr. 23, 1800, ch. 33, Art. XVII, 2 Stat. 47. Among the offenses punishable if committed at sea were murder, embezzlement, and theft. In addition, the Act also provided that "[i]f any person in the navy shall, when on shore, plunder, abuse, or maltreat any inhabitant, or injure his property in any way, he shall suffer such punishment as a court martial shall adjudge." Art. XXVII, 2 Stat. 48. This

There is no doubt that the English practice during this period shows a strong desire in that country to transfer from the Crown to Parliament the control of the scope of court-martial jurisdiction. And it is equally true that Parliament was chary in granting jurisdiction to courts-martial, although not as chary as the *O'Callahan* opinion suggests. But reading Clause 14 consistently with its plain language does not disserve that concern; Congress, and not the Executive, was given the authority to make rules for the regulation of the Armed Forces.

The *O'Callahan* Court cryptically stated: "The 17th century conflict over the proper role of courts-martial in the enforcement of the domestic criminal law was not, however, merely a dispute over what organ of government had jurisdiction. It also involved substantive disapproval of the general use of military courts for trial of ordinary crimes." 395 U. S., at 268. But such disapproval in England at the time of William and Mary hardly proves that the Framers of the Constitution, contrary to the plenary language in which they conferred the power on Congress, meant to freeze court-martial usage at a particular time in such a way that Congress might not change it. The unqualified language of Clause 14 suggests that whatever these concerns, they were met by vesting in Congress, rather than the Executive, authority to make rules for the government of the military.[12]

---

broad grant of jurisdiction to naval courts-martial would suggest that limitations on the power of other military tribunals during this period were the result of legislative choice rather than want of constitutional power.

[12] See, *e. g.*, *O'Callahan*, 395 U. S., at 277 (Harlan, J., dissenting); 1 W. Crosskey, Politics and the Constitution 413–414, 424–426 (1953) (hereinafter Crosskey); Comment 718; but cf. Horbaly 45–56.

The only other basis for saying that the Framers intended the words of Art. I, § 8, cl. 14, to be narrowly construed is the suggestion that the Framers "could hardly have been unaware of Blackstone's strong con-

Given the dearth of historical support for the *O'Callahan* holding, there is overwhelming force to Justice Harlan's reasoning that the plain language of the Constitution, as interpreted by numerous decisions of this Court preceding *O'Callahan*, should be controlling on the subject of court-martial jurisdiction. 395 U. S., at 275–278 (dissenting); cf. *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 696 (1978) ("[W]e ought not 'disregard the implications of an exercise of judicial authority assumed to be proper for [100] years'"), quoting *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 307 (1962).

Decisions of this Court after *O'Callahan* have also emphasized that Congress has primary responsibility for the delicate task of balancing the rights of servicemen against the needs of the military. As we recently reiterated, "'[j]udicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged.'" *Goldman* v. *Weinberger,* 475 U. S. 503, 508 (1986), quoting *Rostker* v. *Goldberg,* 453 U. S. 57, 70 (1981).

demnation of criminal justice administered under military procedures." Duke & Vogel 449. In his Commentaries, Blackstone wrote:

"When the nation was engaged in war . . . more rigorous methods were put in use for the raising of armies and the due regulation and discipline of the soldiery: which are to be looked upon only as temporary excrescences bred out of the distemper of the state, and not as any part of the permanent and perpetual laws of the kingdom. For martial law, which is built on no settled principles, but is entirely arbitrary in it's *[sic]* decisions, is . . . something indulged in rather than allowed as a law. The necessity of order and discipline in an army is the only thing which can give it countenance; and therefore it ought not to be permitted in time of peace, when the king's courts are open to all persons to receive justice according to the laws of the land." 1 W. Blackstone, Commentaries *413.

Although we do not doubt that Blackstone's views on military law were known to the Framers, see Crosskey 411–412, 424–425, we are not persuaded that their relevance is sufficiently compelling to overcome the unqualified language of Art. I, § 8, cl. 14.

Since *O'Callahan*, we have adhered to this principle of deference in a variety of contexts where, as here, the constitutional rights of servicemen were implicated. See, *e. g.*, *Goldman* v. *Weinberger, supra*, at 509–510 (free exercise of religion); *Chappell* v. *Wallace*, 462 U. S. 296, 300–305 (1983) (racial discrimination); *Rostker* v. *Goldberg, supra*, at 64–66, 70–71 (sex discrimination); *Brown* v. *Glines*, 444 U. S. 348, 357, 360 (1980) (free expression); *Middendorf* v. *Henry*, 425 U. S. 25, 43 (1976) (right to counsel in summary court-martial proceedings); *Schlesinger* v. *Councilman*, 420 U. S. 738, 753 (1975) (availability of injunctive relief from an impending court-martial); *Parker* v. *Levy*, 417 U. S. 733, 756 (1974) (due process rights and freedom of expression).

The notion that civil courts are "ill equipped" to establish policies regarding matters of military concern is substantiated by experience under the service connection approach. *Chappell* v. *Wallace, supra*, at 305. In his *O'Callahan* dissent, Justice Harlan forecasted that "the infinite permutations of possibly relevant factors are bound to create confusion and proliferate litigation over the [court-martial] jurisdiction issue." 395 U. S., at 284. In fact, within two years after *O'Callahan*, this Court found it necessary to expound on the meaning of the decision, enumerating a myriad of factors for courts to weigh in determining whether an offense is service connected. *Relford* v. *Commandant, U. S. Disciplinary Barracks*, 401 U. S. 355 (1971). Yet the service connection approach, even as elucidated in *Relford*, has proved confusing and difficult for military courts to apply.[18]

---

[18] See Cooper, *O'Callahan* Revisited: Severing the Service Connection, 76 Mil. L. Rev. 165, 186–187 (1977) (hereinafter Cooper); Tomes, The Imagination of the Prosecutor: The Only Limitation to Off-Post Jurisdiction Now, Fifteen Years After *O'Callahan v. Parker*, 25 Air Force L. Rev. 1, 9–35 (1985) (hereinafter Tomes); cf. *United States* v. *Alef*, 3 M. J. 414, 416, n. 4. (Ct. Mil. App. 1977); *United States* v. *McCarthy*, 2 M. J. 26, 29, n. 1 (Ct. Mil. App. 1976).

Since *O'Callahan* and *Relford*, military courts have identified numerous categories of offenses requiring specialized analysis of the service connection requirement. For example, the courts have highlighted subtle distinctions among offenses committed on a military base, offenses committed off-base, offenses arising from events occurring both on and off a base, and offenses committed on or near the boundaries of a base.[14] Much time and energy has also been expended in litigation over other jurisdictional factors, such as the status of the victim of the crime, and the results are difficult to reconcile.[15] The confusion created by the complexity of the service connection requirement, however, is perhaps best illustrated in the area of off-base drug offenses.[16] Soon after *O'Callahan*, the Court of Military Appeals held that drug offenses were of such "special military significance" that their trial by court-martial was unaffected by the decision. *United States v. Beeker*, 18 U. S. C. M. A. 563, 565, 40 C. M. R. 275, 277 (1969). Nevertheless, the court has changed its position on

---

[14] See, *e. g.*, *United States v. Garries*, 19 M. J. 845 (A. F. C. M. R. 1985) (serviceman's on-post murder of wife held service connected), aff'd, 22 M. J. 288 (Ct. Mil. App.), cert. denied, 479 U. S. 985 (1986); *United States v. Williamson*, 19 M. J. 617 (A. C. M. R. 1984) (serviceman's off-post sexual offense involving young girl held service connected); *United States v. Mauck*, 17 M. J. 1033 (A. C. M. R.) (variety of offenses committed 15 feet from arsenal boundary held service connected), review denied, 19 M. J. 106 (Ct. Mil. App. 1984); *United States v. Scott*, 15 M. J. 589 (A. C. M. R. 1983) (serviceman's off-post murder of another serviceman held service connected where crime had its basis in on-post conduct of participants).

[15] Compare *United States v. Wilson*, 2 M. J. 24 (Ct. Mil. App. 1976) (off-post robbery and assault of a fellow serviceman held not service connected), and *United States v. Tucker*, 1 M. J. 463 (Ct. Mil. App. 1976) (off-post concealment of property stolen from fellow serviceman on-post held not service connected), with *United States v. Lockwood*, 15 M. J. 1 (Ct. Mil. App. 1983) (on-post larceny of fellow serviceman's wallet and use of identification cards in it to obtain loan from an off-post business establishment held service connected), and *United States v. Shorte*, 18 M. J. 518 (A. F. C. M. R. 1984) (off-post felonious assault committed against fellow serviceman held not service connected).

[16] See Cooper 172–182; Tomes 13–31.

the issue no less than two times since *Beeker*, each time basing its decision on *O'Callahan* and *Relford*.[17]

When considered together with the doubtful foundations of *O'Callahan*, the confusion wrought by the decision leads us to conclude that we should read Clause 14 in accord with the plain meaning of its language as we did in the many years before *O'Callahan* was decided. That case's novel approach to court-martial jurisdiction must bow "to the lessons of experience and the force of better reasoning." *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406–408 (1932) (Brandeis, J., dissenting). We therefore hold that the requirements of the Constitution are not violated where, as here, a court-

---

[17] Seven years after *United States* v. *Beeker*, the Court of Military Appeals expressly renounced that decision, holding that *O'Callahan* and *Relford* mandated the conclusion that off-base drug offenses by a serviceman could not be tried by court-martial. See *United States* v. *McCarthy*, *supra; United States* v. *Williams*, 2 M. J. 81, 82 (Ct. Mil. App. 1976); see also *United States* v. *Conn*, 6 M. J. 351, 353 (Ct. Mil. App. 1979); *United States* v. *Alef, supra*, at 415–418. Reversing its position again in 1980, the Court of Military Appeals decided that such a restrictive approach was not required under this Court's decisions. *United States* v. *Trottier*, 9 M. J. 337, 340–351 (1980). The court therefore held that "the gravity and immediacy of the threat to military personnel and installations posed by the drug traffic and . . . abuse convince us that very few drug involvements of a service person will not be 'service connected.' " *Id.*, at 351.

*United States* v. *Trottier*, however, has not settled the confusion in this area. In *Trottier*, the court identified the following exception to its general rule: "[I]t would not appear that use of marijuana by a serviceperson on a lengthy period of leave away from the military community would have such an effect on the military as to warrant the invocation of a claim of special military interest and significance adequate to support court-martial jurisdiction under *O'Callahan*." *Id.*, at 350, n. 28. Since *Trottier*, at least two lower military court decisions have found court-martial jurisdiction over offenses arguably falling within this exception. See *United States* v. *Lange*, 11 M. J. 884 (A. F. C. M. R. 1981), review denied, 12 M. J. 318 (Ct. Mil. App. 1981) (off-post use of marijuana during 6-day leave held sufficient to establish service connection); *United States* v. *Brace*, 11 M. J. 794 (A. F. C. M. R.), review denied, 12 M. J. 109 (Ct. Mil. App. 1981) (off-post use of marijuana during 6-day leave 275 miles from post held sufficient to establish service connection); see also Horbaly 534–535.

martial is convened to try a serviceman who was a member of the Armed Services at the time of the offense charged.[18] The judgment of the Court of Military Appeals is

*Affirmed.*

JUSTICE STEVENS, concurring in the judgment.

Today's unnecessary overruling of precedent is most unwise. The opinion of the United States Court of Military Appeals demonstrates that petitioner's offenses were sufficiently "service connected" to confer jurisdiction on the military tribunal. Unless this Court disagrees with that determination—and I would be most surprised to be told that it does—it has no business reaching out to reexamine the decisions in *O'Callahan* v. *Parker*, 395 U. S. 258 (1969), and *Relford* v. *Commandant, U. S. Disciplinary Barracks*, 401 U. S. 355 (1971). While there might be some dispute about the exact standard to be applied in deciding whether to overrule prior decisions, I had thought that we all could agree that such drastic action is only appropriate when essential to

---

[18] Petitioner argues that the Court of Military Appeals' decision should be reversed because it applies a more expansive subject-matter jurisdiction test to him than had previously been announced. According to petitioner, the exercise of court-martial jurisdiction over him violates his rights under the Due Process Clause of the Fifth Amendment. Our review of the record in this case, however, reveals that petitioner did not raise his due process claim in the Court of Military Appeals. The Court of Military Review, which reinstated the Alaska charges against petitioner, held that military courts had jurisdiction over petitioner's Alaska offenses. Petitioner therefore had an opportunity to raise his due process challenge in the proceedings before the Court of Military Appeals. He has not offered any explanation for his failure to do so. In fact, petitioner, in his reply brief and at oral argument, did not contest the Government's suggestion that he inexcusably failed to raise his due process claim earlier in the proceedings. See Reply Brief for Petitioner 16–19; Tr. of Oral Arg. 36–39. We therefore decline to consider the claim. See, *e. g.*, *Berkemer* v. *McCarty*, 468 U. S. 420, 443 (1984); *Delta Air Lines, Inc.* v. *August*, 450 U. S. 346, 362 (1981); *United States* v. *Lovasco*, 431 U. S. 783, 788, n. 7 (1977).

the disposition of a case or controversy before the Court.* The fact that any five Members of the Court have the power to reconsider settled precedents at random, does not make that practice legitimate.

For the reasons stated by the Court of Military Appeals, I agree that its judgment should be affirmed.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, and with whom JUSTICE BLACKMUN joins in all but the last paragraph, dissenting.

Less than 20 years ago, this Court held in *O'Callahan* v. *Parker*, 395 U. S. 258 (1969), that, to be subject to trial by court-martial, a criminal offense charged against a member of the Armed Forces had to be "service connected," lest the phrase "cases arising in the land or naval forces" in the Fifth Amendment "be expanded to deprive every member of the armed services of the benefits of an indictment by a grand jury and a trial by a jury of his peers." *Id.*, at 273. Today the Court overrules *O'Callahan*. In doing so, it disregards constitutional language and principles of *stare decisis* in its singleminded determination to subject members of our Armed Forces to the unrestrained control of the military in the area of criminal justice. I dissent.

## I

The majority begins by assuming that the limitation on court-martial jurisdiction enunciated in *O'Callahan* was based on the power of Congress, contained in Art. I, § 8, cl. 14, "[t]o make Rules for the Government and Regulation of the land and naval Forces." It then rejects this asserted limitation of congressional power on the ground that the Framers intended to give Congress plenary authority over the

---

*Even in its brief proposing the reconsideration of *O'Callahan*, the United States asked the Court to reconsider that decision only in the event that the Court disagrees with the United States' submission that petitioner's acts of sexual assaults on military dependents are service related. Brief for United States 28.

government of the military. But the Court in *O'Callahan* did not simply address whether Art. I, § 8, cl. 14, granted Congress the authority to create court-martial jurisdiction over all crimes committed by members of the Armed Forces. Congress' Article I power to regulate the Armed Forces is limited by the Fifth Amendment right to indictment or presentment by a grand jury and the Sixth Amendment right to trial by jury.[1] "[T]he constitutional grant of power to Congress to regulate the armed forces," this Court has previously stated, "itself does not empower Congress to deprive people of trials under Bill of Rights safeguards, and we are not willing to hold that power to circumvent those safeguards should be inferred through the Necessary and Proper Clause." *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11, 21–22 (1955). The majority simply disregards the limitations the Bill of Rights imposes on the reach of Art. I, § 8, cl. 14.

The rights to grand jury process and to trial by jury are, of course, of restricted application in military cases. The Fifth Amendment excepts from the grand jury requirement "cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger,"[2] and the

---

[1] In any criminal proceeding brought against petitioner by the State of Alaska, the federal grand jury right would not attach; the Sixth Amendment right would apply by virtue of the Fourteenth Amendment. Whether petitioner would have these rights in any prosecution by a dual sovereign is not at issue here, however. The sole question is whether the Federal Government, when it proceeded against petitioner, was obliged to provide those safeguards guaranteed by the Fifth and Sixth Amendments. See *Grafton* v. *United States*, 206 U. S. 333, 352–354 (1907).

[2] The language of this exception could be understood to mean that "cases arising in the land or naval forces," as well as in the militia, are only excepted from the requirement of grand jury indictment or presentment "in actual service in time of War or public danger." This Court, however, has interpreted the "time of war" provision as referring only to cases arising in the militia, not the land or naval forces. *Johnson* v. *Sayre*, 158 U. S. 109, 114 (1895). I am not convinced this reading of the Fifth Amendment is correct, but need not rely on a different interpretation here.

Court has held this exception applicable to the Sixth Amendment right to trial by jury as well. *Ex parte Milligan,* 4 Wall. 2, 123 (1867). But the text of the exception is inconsistent with the majority's conclusion that the only relevant factor in determining whether a court-martial has jurisdiction over a case is the status of the defendant as a member of the Armed Services.[3]

The Fifth Amendment's exception covers only *"cases arising in* the land and naval forces" (emphasis added). It makes no reference to the *status* of the individual committing the crime. Had that been the Framers' intent, it would have been easy to have said so, given that the grand jury provision of the Amendment, which states that "[n]o Person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," speaks not in terms of "crimes" or "cases," but of individual defendants. Nonetheless, the exception contained in the Fifth Amendment is expressed—and applies by its terms—only to *cases arising in* the Armed Forces. *O'Callahan* addressed not whether Art. I, § 8, cl. 14, empowered Congress to create court-martial jurisdiction over all crimes committed by service members, but rather whether Congress, in exercising that power, had encroached upon the rights of members of Armed Forces whose cases did not "arise in" the Armed Forces. This is clear from the Court's statement of its holding in *O'Callahan:*

> "We have concluded that the crime to be under military jurisdiction must be service connected, lest 'cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger,' as used in the Fifth Amendment, be expanded to deprive every

---

[3] "This Court has constantly reiterated that the language of the Constitution where clear and unambiguous must be given its plain evident meaning." *Reid* v. *Covert,* 354 U. S. 1, 8, n. 7 (1957) (plurality opinion).

member of the armed services of the benefits of an indictment by a grand jury and a trial by a jury of his peers." 395 U. S., at 272–273 (footnote omitted).[4]

---

[4] See also *Relford* v. *Commandant, U. S. Disciplinary Barracks*, 401 U. S. 355, 362–363 (1971); *Gosa* v. *Mayden*, 413 U. S. 665, 672–673 (1973).

The majority contends that, before *O'Callahan*, this Court had held consistently that status as a member of the Armed Forces was an adequate basis for the assertion of court-martial jurisdiction. *Ante*, at 439. But a number of the precedents cited dealt with the assertion of court-martial jurisdiction over individuals who were not members of the Armed Forces and therefore, this Court ruled, did not come within the reach of Art. I, § 8, cl. 14. See *Kinsella* v. *United States ex rel. Singleton*, 361 U. S. 234, 246–248 (1960) (military dependent in noncapital case); *Reid* v. *Covert, supra*, at 19–23 (plurality opinion) (military dependent in capital case); *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11, 14–15 (1955) (discharged veteran); see also *Grisham* v. *Hagan*, 361 U. S. 278 (1960) (civilian military employee in capital case); *McElroy* v. *United States ex rel. Guagliardo*, 361 U. S. 281, 286 (1960) (civilian military employee in noncapital case). Having disposed of these cases on the threshold issue of the reach of the congressional power created by Art. I, § 8, cl. 14, the Court did not consider the limits imposed on the Article I power by the Fifth Amendment.

Several of the remaining cases cited involved crimes committed in the course of the performance of military duties that therefore clearly arose in the Armed Forces. See *Grafton* v. *United States, supra* (murder by Army private serving sentry duty on post); *Johnson* v. *Sayre, supra* (embezzlement of United States funds intended for the Naval service); *Smith* v. *Whitney*, 116 U. S. 167 (1886) (fraud on Navy contracts). In *Smith*, the Court concluded that "such conduct of a naval officer is a case arising in the naval forces, and therefore punishable by court martial under the articles and regulations made or approved by Congress in the exercise of the powers conferred upon it by the Constitution, to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces, without indictment or trial by jury." *Id.*, at 186.

The remaining cases cited by the majority are similarly inapposite. *Coleman* v. *Tennessee*, 97 U. S. 509 (1879), dealt with a murder committed by a soldier in time of war. In *Ex parte Milligan*, 4 Wall. 2 (1867), any reference to the reach of court-martial jurisdiction over persons in the Armed Services was dictum, since the holding of that case was that a civilian was improperly subjected to military jurisdiction during the Civil War in a State which had "upheld the authority of the government, and where the courts are open and their process unobstructed." *Id.*, at 121.

The protections afforded individuals by the Fifth and Sixth Amendments are central to our constitutional scheme of justice. The right to trial by jury, in particular, "ranks very high in our catalogue of constitutional safeguards." *United States ex rel. Toth* v. *Quarles*, 350 U. S., at 16. These protections should not be lightly abrogated. Consequently, the exception in the Fifth Amendment for cases arising in the Armed Forces must be strictly construed. This was the basis for the Court's conclusion, in *Toth*, that the power to authorize trial by court-martial should be limited to "'the least possible power adequate to the end proposed.'" *Id.*, at 23 (emphasis omitted), quoting *Anderson* v. *Dunn*, 6 Wheat. 204, 231 (1821).

The historical evidence considered by the Court in *O'Callahan* is therefore relevant, not to what the Framers intended to include in the scope of the congressional power to regulate the Armed Forces in Art. I, § 8, cl. 14, but to what the Framers, wary of military jurisdiction and familiar with strong restrictions on the scope of that jurisdiction, considered "cases arising in the armed forces." Even assuming that they intended to assign control over the scope of the Article I power to the Legislature, this does not imply that the meaning of the Fifth Amendment's "arising in" exception can be interpreted without reference to the practices of that time.

In that respect it is significant that the British political and legal writing of the 17th and 18th centuries demonstrates a longstanding suspicion of broad court-martial jurisdiction. This suspicion was well known in colonial America, and was based on familiar history.[5] British writers and legislators

---

[5] This attitude is evident in the Petition of Right in 1627, in which the two Houses of Parliament joined in a petition to the Crown to redress four major grievances, the last of which was the trial of soldiers by military commissions. See J. Tanner, English Constitutional Conflicts of the Seventeenth Century 61–62 (1983 reprint). The pertinent portion of the Petition stated:

"VII. [W]hereas no offender of what kind soever is exempted from the proceedings to be used, and punishments to be inflicted by the laws and

took a narrow view of the appropriate scope of court-martial jurisdiction, which manifested itself in a very limited grant of authority to try offenses by court-martial during the period of which the Framers would have been most acutely aware. See, *e. g.*, M. Hale, The History of the Common Law of England 42–43 (6th ed. 1820). Not only was that jurisdiction narrow, it was expressly limited to cases having some connection with the military. The test was not one of status, but one of military relationship. See S. Adye, A Treatise on Courts Martial 60 (1786) ("The crimes that are cognizable by a court martial, as repugnant to military discipline, are pointed out by the mutiny act and articles of war . . . and as to other crimes which officers and soldiers being guilty of, are to be tried for by the ordinary course of law, in like manner with other subjects"); see also 1 C. Clode, Military Forces of the Crown; Their Administration and Government 158

---

statutes of this your realm: nevertheless of late time divers commissions . . . have issued forth . . . according to the justice of martial law, against such soldiers or mariners, or other dissolute persons joining with them, as should commit any murder, robbery, felony, mutiny or other outrage or misdemeanor whatsoever; and by such summary course and order as is agreeable to martial law, and as is used in armies in time of war, to proceed to the trial and condemnation of such offenders, and them to cause to be executed and put to death according to the law martial:

"VIII. By pretext whereof some of your Majesty's subjects have been by some of the said Commissioners put to death, when and where, if by the laws and statutes of the land they had deserved death, by the same laws and statutes also they might, and by no other ought to have been judged and executed." 3 Car. I, ch. 1.

The petition, which prayed revocation of the military commissions, ultimately received royal assent. Tanner, *supra*, at 64.

The Mutiny Act of 1689, 1 Wm. & Mary, ch. 5, went further, providing that "no man may be forejudged of Life or Limb, or subjected to any kind of Punishment by Martial Law, or in any other manner then by the Judgment of his Peers, and according to the known and established Laws of this Realm," limiting this provision only with respect to "Soldiers who shall Mutiny or Stir up Sedition, or shall Defect Their Majesties Service," who might "be brought to a more exemplary and speedy punishment than the usual forms of Law will allow."

(1869) ("It has been a subject of controversy to distinguish the offences that are purely Military (and therefore properly within the cognizance of a Court-martial), from others that are Civil or Political (and therefore properly within the cognizance of the civil tribunals of the community)"); *Grant* v. *Gould*, 2 H. Bl. 69, 99–100, 126 Eng. Rep. 434, 450 (C. P. 1792) ("In this country, all the delinquencies of soldiers are not triable, as in most countries in Europe, by martial law; but where they are ordinary offences against the civil peace they are tried by the common law courts. . . . The object of the mutiny act . . . is to create a court invested with authority to try those who are a part of the army . . . and the object of the trial is limited to breaches of military duty") (emphasis omitted).  The reach of military law in Britain at the time of the Revolution thus permitted courts-martial only for offenses committed by members of the Armed Forces that had some connection with their military service.

The majority disputes the *O'Callahan* Court's suggestion that the British Articles of War forbade the trial of civil offenses by court-martial.  The Court points to Section XIV, Article XVI, of the British Articles of War of 1774, reprinted in G. Davis, Military Law of the United States 581, 593 (3d rev. ed. 1915), which provided:

> "All Officers and Soldiers are to behave themselves orderly in Quarters, and on their March; and whosoever shall commit any Waste or Spoil either in Walks of Trees, Parks, Warrens, Fish Ponds, Houses or Gardens, Corn Fields, Inclosures or Meadows, or shall maliciously destroy any Property whatsoever belonging to any of Our Subjects, unless by order of the then Commander in Chief of Our Forces, to annoy Rebels or other Enemies in Arms against Us, he or they that shall be found guilty of offending herein shall (besides such Penalties as they are liable to by law) be punished according to the Nature and Degree of the Offence, by the Judgment of a Regimental or General Court Martial."

The majority contends that this provision counters any argument that court-martial jurisdiction in Britain at the time of the American Revolution was in any respect limited to offenses not punishable by civil law. *Ante,* at 443. The latter provision, however, appears in a section of the Articles of War captioned "Of Duties in Quarters, in Garrison, or in the Field," and its text suggests that the activities it forbade were considered derelictions of *military* duty, and were punishable by court-martial on that basis.[6]

American colonists shared the British suspicion of broad military authority in courts-martial. One of the grievances stated in the Declaration of Independence was King George III's assent to "pretended Legislation: For quartering large bodies of armed troops among us: For protecting them, by a mock Trial, from punishment for any Murders which they should commit on the Inhabitants of these States." The Framers thus were concerned both with protecting the rights of those subjected to courts-martial, and with preventing courts-martial from permitting soldiers to get away with murder—literally—in the civilian community. This "known hostility of the American people to any interference by the military with the regular administration of justice in the civil courts," *Coleman* v. *Tennessee,* 97 U. S. 509, 514 (1879), makes it unlikely that the Framers considered any crime committed by a member of the Armed Forces, regardless of

[6] See also G. Davis, Military Law of the United States 437 (3d rev. ed. 1915) ("The acts of trespass, etc., indicated in this Article are made punishable as special breaches of discipline, and less for the protection of citizens than for the maintenance of the orderly behavior and morale of the military force") (emphasis omitted); 2 W. Winthrop, Military Law and Precedents 1022 (1896) ("This Article, which, dating from an early period of the British law, first appeared in our code in the Articles of 1776, is designed, by making severely punishable trespasses committed by soldiers on the march or otherwise, to prevent straggling and maintain order and discipline in military commands, while at the same time availing to secure from intrusion and injury the premises and property of the inhabitants") (footnotes omitted).

its lack of connection to military service, to give rise to a "case arising in" the Armed Forces of the new Nation.[7]

This is borne out by provisions in the American Articles of 1776 that are comparable to those in the British Articles of War of 1774. See Section X, Article I, reprinted in 2 W. Winthrop, Military Law and Precedents 1494 (1896); Section XIII, Article 16, reprinted in 2 Winthrop, *supra*, at 1497; Section XVIII, Article 5, reprinted in 2 Winthrop, *supra*, at 1503. The provisions created military offenses where the crimes involved were service connected. This tradition continued after the adoption of the Constitution. With respect to the 1874 Articles of War, for example, Davis wrote:

> "As to whether an act which is a civil crime is also a military offense no rule can be laid down which will cover all cases, for the reason that what may be a military offense under certain circumstances may lose that character under others. . . . But if the act be committed on a military reservation, or other ground occupied by the army, or in its neighborhood, so as to be in the constructive presence of the army; or if committed while on duty, particularly if the injury be to a member of the community whom it is the offender's duty to protect; or if com-

---

[7] But cf. Cong. Globe, 37th Cong., 3d Sess., 953 (1863).

The Court contends that "American military records reflect trials by court-martial during the late 18th century for offenses against civilians and punishable under the civil law, such as theft and assault." *Ante*, at 444. It apparently bases this conclusion on materials provided to the *O'Callahan* Court by the United States. See Brief for United States in *O'Callahan* v. *Parker*, O. T. 1968, No. 646, pp. 35–52, summarizing courts-martial during the period from 1775 to 1815 involving "apparently non-military criminal offenses committed by military personnel." *Id.*, at 35. I agree with the *O'Callahan* Court that, to the extent the courts-martial described there did not appear to deal with crimes that were committed during wartime, were committed by officers, or involved special military interests, the descriptions of the crimes "simply recite the offender and the offense and give no basis for judging the relationship of the offense to military discipline." *O'Callahan* v. *Parker*, 395 U. S. 258, 270, n. 14 (1969).

mitted in the presence of other soldiers, or while in uniform; or if the offender use his military position, or that of another, for the purpose of intimidation or other unlawful influence or object—such facts would be sufficient to make it prejudicial to military discipline . . . ." Davis, *supra*, at 476.

Viewed historically, then, *O'Callahan's* recognition of the service connection requirement did not signify a meaningful change in what could be tried in courts-martial. Quite the reverse: not until the enactment of the Uniform Code of Military Justice in *1950* did Congress attempt to give courts-martial the authority to try the crimes of murder and rape committed in peacetime within the United States. See Duke & Vogel, The Constitution and the Standing Army: Another Problem of Court-Martial Jurisdiction, 12 Vand. L. Rev. 435, 452–453 (1960). Common-law felonies in peacetime were only brought within the court-martial jurisdiction in 1916. Wiener, Courts-Martial and the Bill of Rights: The Original Practice I, 72 Harv. L. Rev. 1, 10–12 (1958). The Framers' conception of what could properly be tried in a court-martial must have informed their understanding of what cases arise in the Armed Forces, thus permitting what would otherwise be unconstitutional infringements of Fifth and Sixth Amendment rights. The relatively recent expansion of the authority of military tribunals appears to disregard the Framers' understanding.

Instead of acknowledging the Fifth Amendment limits on the crimes triable in a court-martial, the Court simply ignores them. But "[t]he concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our Government." *Reid* v. *Covert*, 354 U. S. 1, 14 (1957) (plurality opin-

ion). The limitations may not, in the view of the majority, be desirable, but that does not mean they do not exist.

The requirement of service connection recognized in *O'Callahan* has a legitimate basis in constitutional language and a solid historical foundation. It should be applied in this case.

## II

Application of the service connection requirement of *O'Callahan*, as further elaborated in *Relford* v. *Commandant, U. S. Disciplinary Barracks*, 401 U. S. 355 (1971), demonstrates that petitioner's Alaska crimes do not have an adequate service connection to support the exercise of court-martial jurisdiction. Petitioner's offenses did not detract from the performance of his military duties. He committed these crimes while properly absent from his unit, and there was no connection between his assigned duties and his crimes. Nor did petitioner's crimes threaten people or areas under military control. The crimes were committed in petitioner's private home in the civilian community in Juneau, where there is not even a base for Coast Guard personnel. Petitioner's acts were not likely to go unpunished; the court-martial judge determined that the offenses were of a type traditionally prosecuted by civilian courts, that such courts were available, and that, while the Alaska courts had deferred prosecution in light of the court-martial proceeding, the State had not declined to prosecute the offenses. Nor did the crimes implicate any authority stemming from the war power; they were committed within the territorial United States while the Nation was at peace.

Moreover, the crimes caused no measurable interference with military relationships. Though the victims were dependents of Coast Guard members, the court-martial judge found that there was only *de minimis* military interaction between petitioner and the fathers of the victims, and that the relationships between petitioner and the families of the vic-

tims "were founded primarily upon the ages and activities of the children and additionally upon common sporting interests, common spousal interest and employment and neighborly relationships," App. to Pet. for Cert. 58a, rather than the connection of petitioner and the families through the Coast Guard.[8] Because the crimes did not take place in an area within military control or have any effect on petitioner's military duties, their commission posed no challenge to the maintenance of order in the local command. The military judge found that the Government had not demonstrated any impact of the offenses on "morale, discipline, [or] the reputation or the integrity of the Coast Guard in Juneau." The only connection between the military and the offenses at issue was the fact that the victims were military dependents. But the military judge found explicitly that the military association of petitioner and the victims' fathers did not facilitate petitioner's crimes,[9] and that "[t]he impact apparent in this case, that is, on the parents and the victims themselves is no different than that which would be produced by [a] civilian perpetrator." *Id.*, at 57a.

The military judge, after properly reviewing the *Relford* factors, concluded correctly that they did not render petition-

---

[8] See also 21 M. J. 512, 514 (C. G. C. M. R. 1985) ("A friendship had grown between the accused and both of the other families, grounded in one case, on the common sporting interests of bowling and basketball, and, in the other, on the proximity of living next door. The alleged victims came to the accused's home on a regular basis to visit with his two sons. Both girls at one time played on a soccer team coached by the accused and they also bowled in a league in which the accused was active").

[9] See the military judge's Supplemental Essential Findings of Fact, App. to Pet. for Cert. 62a ("To the extent that trust had a bearing on the opportunity for the alleged offenses, that trust arose out of friendships between the Solorio and Johnson and Solorio and Grantz families and not out of the respective fathers *[sic]* common association as members of the U. S. Coast Guard. The trust placed in a servicemember in general, and in the accused in particular, by virtue of status as a member of the Coast Guard was minimal and had no direct relationship to the offenses alleged").

er's offenses service connected and dismissed the charges. Engaging in what can only be described as impermissible appellate factfinding,[10] the Coast Guard Court of Military

---

[10] The appeal to the Court of Military Review was brought under Article 62, Uniform Code of Military Justice, 10 U. S. C. § 862 (1982 ed., Supp. III). Section 862(b) provides that "[i]n ruling on an appeal under this section, the Court of Military Review may act only with respect to matters of law, notwithstanding section 866(c) of this title (article 66(c))." Title 10 U. S. C. 866(c), Article 66(c) of the Uniform Code of Military Justice, authorizes the Court of Military Review, in acting on findings of guilty and sentences, to "weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact." See also *United States* v. *Burris*, 21 M. J. 140, 143–144 (Ct. Mil. App. 1985).

While the Court of Military Review acknowledged that it was bound by facts found at the trial level unless those findings were incorrect as a matter of law, 21 M. J., at 515, 517, it nonetheless proceeded to assume the facts necessary to its conclusion that the impact on the Coast Guard community at Governors Island created the requisite service connection to justify the exercise of court-martial jurisdiction. One judge on the Court of Military Review, dissenting in part from the court's ruling, rejected the majority's approach:

"Where I depart from the majority is the holding that there was 'service connection' and therefore jurisdiction, in this case, as a matter of law. . . . [T]he [military] judge made no specific findings with respect to the possible effect of the offenses at Governors Island or on personnel under the authority and responsibility of the convening authority. Even if this case were before us for review under Article 66(c), U. C. M. J., 10 U. S. C. § 666(c), I would hesitate to determine that jurisdiction exists in light of this omission. . . . Since this case is before us for review under Article 62(b) U. C. M. J., 10 U. S. C. § 862(b), I do not believe we are empowered to cure an omission from the essential findings of the trial judge." *Id.*, at 523 (Bridgman, J., concurring in part and dissenting in part).

Judge Bridgman would have remanded without prejudice to the accused's right to renew his attack on the jurisdiction of the court-martial. *Ibid.*

The Court of Military Appeals suggested broadly that the Court of Military Review had violated its obligations under Article 62 in this case, but concluded that the violation was immaterial. See 21 M. J. 251, 254 (1986) ("A military judge's factfinding power under Article 62 cannot be superseded by a Court of Military Review in an appeal under Article 62 . . . . To some extent the Court of Military Review may have erred in this direc-

Review reversed the dismissal. 21 M. J. 512 (1985). It concluded that the military judge's finding that the offenses had had no impact on morale or discipline was erroneous because the judge should have considered the effect the offenses would have had on the community in Juneau had they come to light while the victims and their families were still in Alaska, and the impact of the offenses on morale and discipline at Governors Island. Without remanding for further factfinding, the court held that the Alaska offenses had a direct impact upon the good order, discipline, morale, and welfare of Coast Guard personnel at Governors Island. *Id.*, at 519. It further asserted, again without basis in the facts found by the military judge, that the Coast Guard's interest in deterring the offenses was greater than that of the civilian authorities, and that the concerns of the victims' parents would have been different had the offender been a civilian. *Id.*, at 519–520. On the basis of these newly found facts, the Court of Military Review held petitioner's crime sufficiently service connected to justify the exercise of court-martial jurisdiction. *Id.*, at 522.

The Court of Military Appeals affirmed. 21 M. J. 251 (1986). While conceding that its "precedents involving off-base sex offenses against civilian dependents of military personnel would point to a different conclusion," *id.*, at 254, it concluded that a "recent development in our society"—specifically, an increase in concern for the victims of crimes—meant that sex offenses committed against young children of members of the military, which would have "a continuing effect on the victims and their families," *id.*, at 256, sufficed to establish service connection.

The military judge's straightforward application of *O'Callahan* and *Relford* was plainly correct given the facts as he found them, facts that the reviewing courts have not demonstrated to have been clearly erroneous. The Court of Mili-

tion; but any such error is immaterial, because on the basis of indisputed facts, we conclude that the offenses in Alaska were service-connected").

tary Appeals' apparent conclusion that serious or disturbing crimes committed upon military dependents sufficed to create court-martial jurisdiction ignored this Court's prior decisions.

The majority asserts that "the service connection approach, even as elucidated in *Relford*, has proved confusing and difficult for military courts to apply." *Ante*, at 448. It is true that the test requires a careful, case-specific factual inquiry. But this is not beyond the capacity of the military courts. Indeed, the military judge in this case engaged in a thorough and thoughtful application of the *Relford* factors. It should not be surprising that such determinations may at times be difficult or time consuming or require the drawing of narrow distinctions. The trial of any person before a court-martial encompasses a deliberate decision to withhold procedural protections guaranteed by the Constitution. Denial of these protections is a very serious matter. The Framers declined to draw an easy line, like that established by the Court today, which would sweep an entire class of Americans beyond the reach of the Bill of Rights. Instead, they required that the protections of the Fifth and Sixth Amendments be applied in any case not "arising in" the Armed Forces. This requirement must not be discarded simply because it may be less expeditious than the majority deems appropriate.

## III

*O'Callahan* v. *Parker* remains correct and workable today. The Court nonetheless insists on reopening a question which was finally and properly resolved in 1969. In doing so, it shows a blatant disregard for principles of *stare decisis*, and makes more dubious the presumption "that bedrock principles are founded in the law rather than in the proclivities of individuals." *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986). This in turn undermines "the integrity of our constitutional system of government, both in appearance and in fact."

*Ibid.;* see also *Pollock* v. *Farmers' Loan & Trust Co.,* 158 U. S. 601, 663 (1895) (Harlan, J., dissenting).

The Court's willingness to overturn precedent may reflect in part its conviction, frequently expressed this Term, that members of the Armed Forces may be subjected virtually without limit to the vagaries of military control. See *United States* v. *Stanley, post,* p. 669; *United States* v. *Johnson,* 481 U. S. 681 (1987). But the Court's decision today has, potentially, the broadest reach of any of these cases. Unless Congress acts to avoid the consequences of this case, every member of our Armed Forces, whose active duty members number in the millions, can now be subjected to court-martial jurisdiction—without grand jury indictment or trial by jury—for *any* offense, from tax fraud to passing a bad check, regardless of its lack of relation to "military discipline, morale and fitness." *Schlesinger* v. *Councilman,* 420 U. S. 738, 761, n. 34 (1975). Today's decision deprives our military personnel of procedural protections that are constitutionally mandated in trials for purely civilian offenses. The Court's action today reflects contempt, both for the members of our Armed Forces and for the constitutional safeguards intended to protect us all. I dissent.