**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**September 5, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

AARON W. WILSON,

     Petitioner - Appellant,

v.

DOUGLAS J. CURTIS, Commandant,
United States Disciplinary Barracks,

     Respondent - Appellee.

_____

No. 24-3064

SEAN J. DILLON,

     Petitioner - Appellant,

v.

DOUGLAS J. CURTIS, Commandant,
United States Disciplinary Barracks,

     Respondent - Appellee.
_____

No. 24-3065

**Appeals from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:21-CV-03277-JWL)**
**(D.C. No. 5:22-CV-03088-JWL)**
_____

Stephen I. Vladeck, Washington, D.C. (Kayla Gassmann, Assistant Public Defender,
Kansas Federal Public Defender, Kansas City, Kansas, with him on the briefs), for
Petitioners-Appellants.

Graham White, Attorney, Appellate Staff (Brian M. Boynton, Principal Deputy Assistant Attorney General, Kate E. Brubacher, United States Attorney, Sharon Swingle, Attorney, Appellate Staff, with him on the briefs), Civil Division, United States Department of Justice, Washington, D.C., for Respondent-Appellee.

_____

Before **HARTZ**, **TYMKOVICH**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

Aaron Wilson and Sean Dillon, both former members of the United States Army, were convicted by court-martial for engaging in sex crimes during their active-duty service. Wilson and Dillon filed habeas petitions, arguing that the statutory grant of military jurisdiction over retired military personnel—particularly, those who have been medically retired—exceeds Congress's authority to "make Rules for the Government and Regulation of the land and naval Forces" because, in their view, retirees are no longer part of "the land and naval Forces." U.S. Const. art. I, § 8, cl. 14 ("Make Rules Clause"). The district court denied their petitions. We affirm.

"In an unbroken line of decisions," the Supreme Court has "interpreted the [Make Rules Clause] as conditioning the proper exercise of court-martial jurisdiction over an offense on one factor: the military status of the accused." *Solorio v. United States*, 483 U.S. 435, 439 (1987). Medical retirees satisfy that standard: They hold a military rank, they may wear their uniform under certain circumstances, they receive disabled pay, and they remain subject to active-duty recall at the military's discretion. Unlike separated servicemembers, medical retirees have not "severed all

2

relationship with the military and its institutions." *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 14 (1955). Accordingly, medical retirees are part of "the land and naval Forces," U.S. Const. art. I, § 8, cl. 14, and the statutory grant of military jurisdiction over them is constitutional.[1]

## I.

## A.

The Army is one of six branches in the United States Armed Forces, alongside the Navy, the Air Force, the Marine Corps, the Space Force, and the Coast Guard. 10 U.S.C. § 101(a)(4). As with the other five branches, Title 10 of the United States Code governs many of the Army's organizational practices. *See id.* §§ 101–5553, 7001–842. This includes the Army's dealings with servicemembers who decide to leave active-duty service through retirement or separation. *See id.* §§ 1161–315.

Retirement and separation are distinct classifications with meaningful differences. A "retired" servicemember receives retired pay and "may be ordered to active duty . . . at any time" under "regulations prescribed by the Secretary of Defense." 10 U.S.C. § 688. A "separated" servicemember, by contrast, does not receive retired pay and is not subject to involuntary recall. Retirees are subject to the Uniform Code of Military Justice ("UCMJ") and may be tried by court-martial, *see id.* § 802(a)(4); separated servicemembers are no longer subject to the UCMJ and

---

[1] Because we conclude that the statutory grant of jurisdiction over medically retired servicemembers is constitutional, we need not address the parties' dispute about whether Dillon was retired at the time of his court-martialing. Regardless of Dillon's retirement status, the Army's exercise of jurisdiction was proper.

may not be tried by court-martial—even for offenses committed while in active service, *see Toth*, 350 U.S. at 13–14.[2]

When the Army determines that a servicemember is "unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability," it "may retire the member." 10 U.S.C. § 1201(a). Medical retirees are not exempt from recall, *see id.* § 688; rather, the Army may "order any retired regular member" to perform whatever duties are "deemed necessary in the interests of national defense." Management of Regular and Reserve Retired Military Members, Dep't of Defense Instruction 1352.01, ¶ 3.3(b)(2) (Dec. 8, 2016). Still, medical retirees are "generally [ ] deployed to civilian defense jobs upon mobilization, unless they have critical skills or volunteer for specific military jobs." *Id.* ¶ 3.2(g)(2); *see id.* ("The nature and extent of the mobilization of [a medical retiree] will be determined . . . based on the retiree's military skill and, if applicable, the nature and degree of the retiree's disability."). If a disabled servicemember does not wish to accept retirement, he may instead request voluntary separation from the Army and return to civilian life. *See* Active Duty Enlisted Separations, U.S. Dep't of Army, Reg. 635-200, ¶ 4-4 (Dec. 17, 2009).

---

[2] *See generally Denby v. Berry*, 263 U.S. 29, 35–36 (1923) (contrasting officers who have "retired from active service" with those who "become a civilian" when they are "wholly retired" and "removed from the service entirely").

**B.**

Aaron Wilson enlisted in the Army in 1992. In 2012, a Physical Evaluation Board concluded that Wilson was suffering from post-traumatic stress disorder and bipolar disorder II. As a result, the Army permanently retired Wilson under 10 U.S.C. § 1201 and assigned him a disability rating of thirty percent. Wilson continued to receive fixed pay at the rank of Staff Sergeant.

In 2017—approximately five years after Wilson's retirement—a court-martial brought a series of criminal charges against him for crimes he committed while he was stationed in Seoul, South Korea between 2005 and 2009. The first charge alleged that Wilson repeatedly "commit[ted] sodomy with . . . a child under the age of 12," in violation of Article 125 of the UCMJ. R. Vol. I at 58 (Wilson). The second charge alleged that Wilson "cause[d] sexual contact with . . . a child who had not attained the age of 12" by touching the child's "breast, buttocks, and genitalia," in violation of Article 120 of the UCMJ.[3]  *Id.*

Wilson contested the court-martial's jurisdiction, arguing that his status as a permanently disabled retiree rendered him both statutorily and constitutionally ineligible for military trial. After the military judge rejected Wilson's jurisdictional challenge, Wilson pleaded guilty to both charges, was dishonorably discharged, and received a seventeen-year sentence in military prison. Wilson then appealed his

---

[3] The court-martial also brought, but ultimately moved to dismiss, two additional charges. Because those charges were dismissed, we do not detail them here.

5

convictions to the United States Army Court of Criminal Appeals ("ACCA"), renewing his jurisdictional objections. ACCA affirmed, and the United States Court of Appeals for the Armed Forces denied Wilson's petition for discretionary review.

After exhausting his military appeals, Wilson filed a petition for a writ of habeas corpus in the United States District Court for the District of Columbia, seeking to collaterally attack his court-martial conviction. The court transferred Wilson's petition to the United States District Court for the District of Kansas—the district in which Wilson is incarcerated.

## C.

Sean Dillon enlisted in the Army in 1996. In 2014, a Physical Evaluation Board concluded that Dillon was suffering from post-traumatic stress disorder, depression, a traumatic brain injury, and several other bodily injuries, resulting in a disability rating of ninety percent. The Army directed that Dillon be involuntarily retired no later than November 30, 2015.

The Army issued Dillon's retirement orders on September 11, 2015, and specified that his retirement would go into effect on November 29, 2015. On September 23, 2015, Dillon signed his Department of Defense Form 214 ("DD-214"), which likewise included an effective retirement date of November 29, 2015. At the district court, Dillon claimed—and the government did not dispute—that he subsequently cleared post, received his retirement orders and a ceremonial flag, and went on transition leave.

On November 3, 2015—approximately four weeks before Dillon's effective retirement date—the Army voided Dillon's DD-214 and revoked his retirement orders "due to pending General Court Martial."  R. Vol. I at 60 (Dillon).  On November 25, 2015, a court-martial brought a series of charges against Dillon for crimes he committed while in active duty.  On April 28, 2016, Dillon was found guilty of three specifications of sexual assault, one specification of aggravated sexual assault of a child, one specification of aggravated sexual assault, one specification of sodomy by force and without consent, and one specification of indecent acts, in violation of Articles 120, 125, and 134 of the UCMJ.  Dillon was dishonorably discharged and sentenced to approximately thirty years' confinement.

Dillon appealed his conviction to ACCA, arguing (among other things) that the court-martial lacked jurisdiction to try him because he was medically retired.  ACCA affirmed, concluding that "[a]lthough [Dillon] was close to retirement before any charges were preferred, he was not, in fact, retired."  *Id.* at 126 n.2.  The United States Court of Appeals for the Armed Forces then denied Dillon's petition for review.  After exhausting his military appeals, Dillon filed a petition for a writ of habeas corpus in the United States District Court for the District of Kansas, seeking to collaterally attack his court-martial conviction.

**D.**

The district court denied both Wilson's and Dillon's petitions.[4]  In Wilson's case, the court explained that "the Supreme Court has made clear that the proper exercise of court-martial jurisdiction under the Make Rules Clause depends on the single factor of 'the military status of the accused.'"  R. Vol. I at 268–69 (Wilson) (quoting *Solorio*, 483 U.S. at 439).  "[T]he necessary military status," the court concluded, "is evidenced by a formal relationship with the military that includes an obligation to obey orders."  *Id.* at 270.  And because Wilson remained subject to recall, "chose to maintain his military status as a medical retiree instead of . . . separat[ing] himself from the military entirely and return[ing] to civilian life," *id.* at 274 n.5, and otherwise "maintained his formal relationship with the military," *id.* at 274, the court held that the Army's exercise of court-martial jurisdiction over Wilson was constitutional.

In Dillon's case, the district court agreed with ACCA that Dillon was not retired at the time of his court-martial "because his retirement orders were revoked prior to the effective date of the retirement."  R. Vol. I at 310 (Dillon).  The court further concluded that, even if Dillon was retired, the Army's exercise of court-martial jurisdiction over him was constitutional for the same reasons set forth in Wilson's case.

Wilson and Dillon timely appealed.

---

[4] The same judge heard both cases.  *See Wilson v. Payne*, 731 F. Supp. 3d 1232 (D. Kan. 2024); *Dillon v. Payne*, 2024 WL 1885504 (D. Kan. Apr. 30, 2024).

## II.

Appellants urge reversal of the district court's denial of their habeas petitions on two primary grounds. First, they argue that the Constitution forecloses all courts-martial of retired servicemembers, rendering their convictions void for lack of jurisdiction. Second, they argue that, even if the Constitution permits courts-martial of some retired servicemembers, that authority does not extend to those who have been permanently retired due to medical disability. We address and reject each argument in turn.

## A.[5]

We review de novo the district court's denial of habeas relief. *Santucci v. Commandant, U.S. Disciplinary Barracks*, 66 F.4th 844, 871 (10th Cir. 2023). Factual findings, if any, are reviewed for clear error. *Stouffer v. Trammell*, 738 F.3d 1205, 1213 (10th Cir. 2013).

---

[5] As a preliminary matter, we agree with Appellants that we need not defer to Congress in determining who may be constitutionally subjected to court-martial jurisdiction under the Make Rules Clause. As the D.C. Circuit explained, the Supreme Court has "repeatedly declined to defer to Congress" in determining who falls within the term "land and naval Forces." *Larrabee v. Del Toro*, 45 F.4th 81, 87 (D.C. Cir. 2022) (Rao, J., joined by Tatel, J.) (collecting cases). This practice makes sense: "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803). "Although Congress maintains 'plenary' authority under the Make Rules Clause to determine which offenses may be punished by court-martial, it does not possess the anterior authority to define which persons may be constitutionally court-martialed." *Larrabee*, 45 F.4th at 87 (Rao, J., joined by Tatel, J.).

**1.**

The Constitution grants Congress the authority to "make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cl. 14. Exercising this power, Congress has authorized courts-martial to try "[r]etired members of a regular component of the armed forces who are entitled to pay." 10 U.S.C. § 802(a)(4). Appellants argue that this extension of jurisdiction violates the Constitution.[6] Based on the text of the Make Rules Clause, as well as relevant Supreme Court precedents, we disagree.

**i.**

Whether a class of persons may be constitutionally subjected to court-martial jurisdiction turns "on one factor: the military status of the accused." *Solorio*, 483 U.S. at 439. The Supreme Court has not established a rule for determining a person's "military status." It has, however, provided significant guidance on two related issues.

First, the Court has repeatedly held constitutional the exercise of court-martial jurisdiction over non-traditional servicemembers who have *ongoing duties* to the military. For example, in *Ex parte Reed*, the Court concluded that a Navy paymaster's clerk was amenable to court-martial despite never being formally

---

[6] At the district court, Wilson also advanced a statutory objection to the court-martial's jurisdiction. Specifically, he argued that he does not fall within the scope of § 802(a)(4) because, in his view, he is not receiving "retired pay." R. Vol. I at 16–19. Because Wilson is no longer pursuing that argument, we do not address it. *See* Aplt. Br. at 7 n.2 (Wilson).

10

inducted into the Navy because he agreed to serve on a Navy vessel, took an oath, wore a uniform, and was on the Navy's payroll. 100 U.S. 13, 19–22 (1879); *see id.* at 22 ("If these officers are not in the naval service, it may well be asked who are."). Similarly, in *Kahn v. Anderson*, the Court upheld the exercise of court-martial jurisdiction over a group of soldiers who had committed crimes after being placed in military custody. 255 U.S. 1, 7–8 (1921). In doing so, the Court rejected the soldiers' argument that, because of their initial convictions, they had "ceased to be soldiers and were no longer subject to military law." *Id.* at 7. And in *Billings v. Truesdell*, the Court upheld the exercise of court-martial jurisdiction over a class of persons who had disobeyed lawful draft orders. 321 U.S. 542, 556 (1944) ("We have no doubt of the power of Congress to enlist the man-power of the nation for the prosecution of the war and to subject to military jurisdiction those who are unwilling, as well as those who are eager, to come to the defense of their nation in its hour of peril.").

By contrast, the Court has held unconstitutional the exercise of court-martial jurisdiction over individuals who owed no duties to the military. In *United States ex rel. Toth v. Quarles*, the Court concluded that Congress may not subject ex-servicemembers to court-martial jurisdiction—even for crimes committed during active-duty service, *see* 350 U.S. at 21–23—because ex-servicemembers have "severed all relationship with the military and its institutions," *id.* at 14. Similarly, in *Reid v. Covert*, the Court held that Congress may not subject civilian dependents of active-duty servicemembers to court-martial jurisdiction because they have "never

11

been members of the army, ha[ve] never been employed by the army, [and] ha[ve] never served in the army in any capacity." 354 U.S. 1, 32 (1957). And in *McElroy v. United States ex rel. Guagliardo*, the Court held that Congress may not subject private military contractors to court-martial jurisdiction unless the contractors have voluntarily bound themselves to the military, as the paymaster's clerk did in *Ex parte Reed*. 361 U.S. 281, 286 (1960).

Second, the Supreme Court has held in other contexts that military retirees are part of the armed forces because they maintain a *formal relationship* with the military. In *United States v. Tyler*, the Court concluded that, although retirees are "not required to perform full service, they are [still] part of the [armed forces], and may be assigned to such duty as the laws and regulations permit." 105 U.S. 244, 245 (1881) (holding that a retired Army captain was entitled to statutory benefits because his years as a retired officer qualified as military service); *see Thornley v. United States*, 113 U.S. 310, 315 (1885) ("The point on which [*Tyler*] turned was . . . that an officer of the army, though retired, was still in the service."). Similarly, in *Barker v. Kansas*, the Court explained that "[m]ilitary retirees unquestionably remain in the service." 503 U.S. 594, 599 (1992) (discussing taxation of military retirement benefits). And in *Kahn v. Anderson*, the Court concluded that "it is not open to question . . . that [retired] officers are officers in the military service of the United States." 255 U.S. at 6 (rejecting the argument that retired officers are not in the armed forces and thus may not sit on court-martial panels); *see McCarty v. McCarty*,

12

453 U.S. 210, 221–22 (1981) (explaining, in the context of the division of military retirement pay, that "[t]he retired officer remains a member of the Army").

Based on these precedents, we conclude that retired servicemembers hold military status. Like the accused in *Ex parte Reed*, *Kahn*, and *Billings*, retired servicemembers have an ongoing duty to obey military orders: As Appellants acknowledge, the military may involuntarily recall retirees to active-duty service at any time. *See* 10 U.S.C. § 688. Further, like the retirees in *Tyler*, *Barker*, and *Kahn*, present-day retired servicemembers maintain a formal relationship with the military: They may wear their uniform in limited circumstances, *see* Aplt. Br. at 17 (Wilson); they hold a military rank, *see* R. Vol. I at 168 (Wilson); and they receive retired pay. Taken together, these factors distinguish retirees from separated servicemembers, who have "severed all relationship with the military and its institutions." *Toth*, 350 U.S. at 14.

In so holding, we join the conclusion of all three appellate courts that have addressed the issue. *See Larrabee v. Del Toro*, 45 F.4th 81, 83 (D.C. Cir. 2022) (upholding the exercise of court-martial jurisdiction over Fleet Marine Corps Reservist); *United States v. Begani*, 81 M.J. 273, 278 (C.A.A.F. 2021) (upholding the exercise of court-martial jurisdiction over Navy Fleet Reservists in part because reservists "are still paid, subject to recall, and required to maintain military readiness" and have not "'severed all relationship' with the military"); *United States ex rel. Pasela v. Fenno*, 167 F.2d 593, 595 (2d Cir. 1948) (similar).

**ii.**

Appellants argue that the historical treatment of retired servicemembers is inconsistent with this conclusion.  Specifically, they argue that the D.C. Circuit's historical analysis in *Larrabee* is "both factually and methodologically mistaken," thus tainting the D.C. Circuit's holding.  Aplt. Br. at 32 (Wilson); Aplt. Br. at 37 (Dillon).  We disagree.  As we explain, there are few examples of how Founding-era Americans understood the Make Rules Clause.  And those that we have identified do not foreclose our conclusion that, under the text of the Make Rules Clause and relevant Supreme Court precedents, Congress may constitutionally subject military retirees to court-martial jurisdiction.

In *Larrabee*, the D.C. Circuit detailed two historical events that, in its view, support Congress's authority to subject retired officers to military jurisdiction.  The first involved the pre-Revolutionary example of "half-pay" officers.[7]  In the seventeenth century, the British government offered reduced salaries to certain officers during peacetime.  *See* John Childs, *The British Army of William III, 1689–1702*, at 70 (1987).  These officers were permitted to live ordinary civilian lives, with one exception—a requirement to return to active-duty service if ordered.  N.A.M. Rodger, *Commissioned Officers' Careers in the Royal Navy, 1690–1815*, 3 J. for Mar. Rsch. 85, 90–91 (2001).  Based on the officers' military connection, Parliament

---

[7] *See Loving v. United States*, 517 U.S. 748, 760 (1996) ("We have undertaken before . . . the difficult task of interpreting [the Make Rules Clause] by drawing upon English constitutional history.").

considered them part of "his Majesty's land forces and marines." 9 Geo. 2 c. 34, § 21 (1735).

For some time, there was "considerable debate about whether these officers should be subjected to the jurisdiction of peacetime courts-martial." *Larrabee*, 45 F.4th at 92 (collecting sources). Parliament alternated its practices, initially subjecting half-pay officers to court-martial jurisdiction, *see* 22 Geo. 2 c. 5 (1749), and later repealing that authority, *see* Marc J. Emond, *Can Grandpa Really be Court-Martialed? The Constitutionality of Imposing Military Law upon Retired Personnel*, 231 Mil. L. Rev. 165, 184–86 (2024); 24 Geo. 2 c. 6 (1751). Eventually, Parliament elected to subject only certain half-pay officers to court-martial jurisdiction. Emond, *supra*, at 185 n.33.

Years later, the Continental Congress tried to institute a similar system, pledging to give half pay to retired American officers at the end of the Revolutionary War. *See* 11 *Journals of the Continental Congress, 1774–1789*, at 502–03 (Worthington Chauncey Ford ed., 1908) [hereinafter *Journals*]. Consistent with Parliament's earlier practices, Congress directed the Continental Army to make certain officers amenable to involuntary recall. *See* 21 *Journals*, at 1180. Based on these records, the D.C. Circuit concluded that "[t]he idea that an inactive-duty soldier might be part of the Continental Army's 'forces' was [ ] not foreign to Founding-era Americans." *Larrabee*, 45 F.4th at 93–94.

The court's second historical example involved Founding-era American courts-martial of furloughed officers for mutiny. *Id.* at 94. Near the end of the

15

Revolutionary War, Congress furloughed many soldiers in the Continental Army. 24 *Journals*, at 267–71, 364–65, 390. In June 1783, a large group of furloughed soldiers staged a violent protest in Philadelphia. After the mutiny, Congress instructed the Army to "confine and bring to trial" any active participants. *Id.* at 412–13. Pursuant to this directive, some furloughed soldiers were court-martialed for mutiny. 25 *Journals*, at 565–66. This, the D.C. Circuit concluded, showed that Founding-era Americans understood inactive-duty soldiers to be "part of 'the land and naval forces.'" *Larrabee*, 75 F.4th at 94.

Appellants contend that each of these examples omits key information that proves that Founding-era practices actually "*rejected* the ability of courts-martial to try inactive military personnel for offenses committed while they were inactive." Aplt. Br. at 40 (Wilson); Aplt. Br. at 45 (Dillon). First, Appellants note that Parliament subjected half-pay officers to court-martial jurisdiction only briefly, and "quickly repealed" that authority "entirely in response to popular opposition" to that practice. Aplt. Br. at 36 (Wilson); Aplt. Br. at 41–42 (Dillon). This, Appellants argue, shows that "British practice rejected military jurisdiction over half-pay officers at the time of the Founding." Aplt. Br. at 38 (Wilson); Aplt. Br. at 43 (Dillon). Second, Appellants argue that the only "furloughed" soldiers who were court-martialed for mutiny had "refused to accept the furloughs," indicating that they were "still on active duty" at the time of their courts-martial. Aplt. Br. at 40 (Wilson); Aplt. Br. at 46 (Dillon). This, Appellants argue, renders any reference to the Pennsylvania Mutiny unhelpful.

16

We agree with Appellants that these historical facts reduce the weight that should be given to the examples of half-pay officers and furloughed soldiers in the Pennsylvania Mutiny. Perhaps that is why the government does not rely heavily on these events, instead resting its briefing primarily on the text of the Make Rules Clause and longstanding Supreme Court precedents.[8] *See* Aple. Br. at 16–25 (discussing in detail the Supreme Court's treatment of military retirees and other non-active-duty servicemembers); *id.* at 26–27 (briefly explaining the D.C. Circuit's discussion of half-pay officers but omitting any discussion about the court-martialing of furloughed soldiers during the Pennsylvania Mutiny).

But we cannot agree with Appellants that history *favors* their position. As the D.C. Circuit explained, half-pay officers were court-martialed throughout the eighteenth century "beginning in the early 1700s under the Mutiny Act adopted in 1689." *Larrabee*, 45 F.4th at 92. Thus, Parliament's 1749 amendment of the Act did not introduce the practice of court-martialing, but instead "ma[de] clear that half-pay

---

[8] The government also references Congress's historical authorizations of court-martial jurisdiction in the years since the Founding to support its position. *See, e.g.*, Aple. Br. at 29 (explaining that Congress has subjected retired naval officers to military jurisdiction since 1857); *id.* (same, for Army and Marine Corps officers, beginning in 1861); *id.* (claiming that retirees have been a part of the military by statute since 1878); *id.* at 30 (discussing the court-martialing of retirees in the nineteenth and twentieth centuries); *id.* at 30–31 (referencing Congress's decision to retain court-martial jurisdiction over retirees after some discussion). Because these examples are from the mid-to-late nineteenth century, they are not probative of the original meaning of the Make Rules Clause. They do, however, bolster the conclusion that the Supreme Court has not previously taken issue with the exercise of court-martial jurisdiction over retirees. *See generally United States v. Fletcher*, 148 U.S. 84 (1893) (affirming the court-martial sentence of a retiree without questioning the constitutionality of the military proceedings).

officers were subject to court-martial jurisdiction" because "the Act's [original] terms furnished uncertain legal grounds for those proceedings." *Id.* And although Parliament repealed that amendment a few years later, it again subjected half-pay officers who held brevet rank to court-martial jurisdiction in 1786. *See* Emond, *supra*, at 185 n.133. At a minimum, this shows that "[t]he idea that an inactive-duty soldier might be part of the Continental Army's 'forces' was [ ] not foreign to Founding-era Americans." *Larrabee*, 45 F.4th at 93–94.

Because decisive historical evidence in either direction is lacking, we rest our conclusion on the text of the Make Rules Clause, along with centuries of Supreme Court precedents indicating that servicemembers remain part of the "land and naval Forces" when they choose to retire, rather than separate.[9] *See supra* Part II.A.1.i.

**iii.**

Despite the textual and precedential support for our conclusion, Appellants insist that the Constitution forecloses courts-martial over retirees for several additional reasons. As we explain, none is persuasive.

---

[9] We disagree with Appellants' assertion that the example of half-pay officers was "[a]t the heart of the [D.C. Circuit's] analysis" in *Larrabee*. Aplt. Br. at 36 (Wilson); Aplt. Br. at 41 (Dillon). Indeed, the D.C. Circuit based its holding primarily on an examination of Supreme Court precedents. *Larrabee*, 45 F.4th at 91 (concluding that the Supreme Court's "decisions construing the scope of the Make Rules Clause, read together, suggest that a person is part of the 'land and naval Forces' and may be subject to court-martial jurisdiction if he has a formal relationship with the armed forces that includes a duty to obey military orders."). Accordingly, we do not understand *Larrabee* to be in tension with our analysis.

First, Appellants claim that, under the Supreme Court's decision in *Toth*, the government bears the burden to demonstrate that court-martial jurisdiction is necessary to maintain good order and discipline. We disagree. In *Toth*, the Court addressed whether a former servicemember who had become a civilian—in other words, separated from the service—could be court-martialed for crimes he committed while in military service. 350 U.S. at 22–23. In concluding that he could not, the Supreme Court did not impose any limitations on the exercise of court-martial jurisdiction over persons who hold "military status" and are part of "the land and naval Forces." *See id.* And, as we have explained, the Court has not required the government to show necessity in any previous cases. *See supra* Part II.A.1.i. To the contrary, it has made clear that the constitutionality of court-martial jurisdiction turns "on one factor: the military status of the accused." *Solorio*, 483 U.S. at 439.

Second, Appellants claim that retired servicemembers cannot be subjected to court-martial jurisdiction because they are subject to only one order during retirement—the obligation to return to active-duty service, if called. This, Appellants argue, makes retired servicemembers akin to the millions of civilians who are registered with the Selective Service System. We disagree. To begin, Appellants do not explain "why a servicemember who must obey one order is less a part of 'the land and naval Forces' than his peer who must obey two." *Larrabee*, 45 F.4th at 98 (citing *Toth*, 350 U.S. at 17 ("[I]t is the primary business of armies and navies to fight *or be ready to fight wars should the occasion arise*." (emphasis added))). And unlike Selective Service Registrants—whose relationship with the military begins

only *after* being ordered to serve—servicemembers who retire (rather than separate) from active-duty military service consciously choose not to sever their *preexisting* relationship with the armed forces.

Third, Appellants argue that the Supreme Court has consistently avoided a "formalistic" approach and focused instead on the "functional question—whether the accused could actually be regarded as falling within the term 'land and naval forces.'" Aplt. Br. at 22 (Wilson) (quotation omitted); Aplt. Br. at 28 (Dillon) (quotation omitted). Specifically, they claim that the Supreme Court's decisions have asked "whether, at the time of their court-martial, the accused had any current authority or obligation to act in a military capacity." Aplt. Br. at 24 (Wilson); Aplt Br. at 29 (Dillon). This argument misconstrues Supreme Court precedents. As the D.C. Circuit correctly explained, "[t]o determine the status of a person tried at court-martial, the Court has consistently analyzed whether [a servicemember] has a legal relation to the military that entails an obligation to obey military orders—or whether, by contrast, he is a 'civilian[] . . . entitled to [the] safeguards afforded . . . by Article III of the Constitution.'" *Larrabee*, 75 F.4th at 98 (quoting *Toth*, 350 U.S. at 23).

Finally, Appellants contend that courts-martial "do not adequately protect the rights of those not in actual service." Aplt. Br. at 11 (Wilson); Aplt. Br. at 17 (Dillon) (explaining that courts-martial lack some of the constitutional protections afforded by Article III courts). But our sole responsibility is to ensure that Congress acts within the bounds of its authority—not to determine whether congressional

20

decisions are wise or fair.  Further, as all agree, the Constitution permits disciplinary differences between civilians and members of the armed forces.  *See generally Parker v. Levy*, 417 U.S. 733, 743–44 (1974) ("[T]he military is, by necessity, a specialized society different from civilian society. . . . [T]he rights of men in the armed forces must [ ] be conditioned to meet certain overriding demands of discipline and duty." (cleaned up)).  And, as we have established, unlike their separated counterparts, military retirees are in the "actual service."  Aplt. Br. at 11 (Wilson); Aplt. Br. at 17 (Dillon).

* * *

Based on the text of the Make Rules Clause, as well as the holdings of relevant Supreme Court precedents, we conclude that retired servicemembers hold military status and are thus amenable to court-martial jurisdiction.  Retired servicemembers have an ongoing duty to obey military orders:  As Appellants acknowledge, the military may involuntarily recall retirees to active-duty service at any time.  Further, retired servicemembers maintain a formal relationship with the military:  They may wear their uniform in limited circumstances, they hold a military rank, and they receive retired pay.  Taken together, these factors distinguish retirees from separated servicemembers, who have "severed all relationship with the military and its institutions."  *Toth*, 350 U.S. at 14.

**B.**

For the same reasons, we conclude that medically retired servicemembers hold military status and are thus amenable to military jurisdiction.  Like traditional

21

retirees, medical retirees maintain their relationship with the military:  They may wear their uniform in certain circumstances, Aplt. Br. at 22 (Dillon); they hold a military rank, *see* R. Vol. I at 168 (Wilson) (noting Wilson's retirement rank of Staff Sergeant); they receive disability benefits, Aplt. Br. at 46 (Wilson); and they are subject to active-duty recall at the military's discretion, *see* 10 U.S.C. § 688.

Appellants identify several reasons why medical retirees should not be subject to court-martial jurisdiction.  To begin, they argue that, under current government regulations, it is "practically impossible" for medically retired servicemembers to be "involuntarily recalled to active-duty military service."  Aplt. Br. at 46 (Wilson); Aplt. Br. at 51 (Dillon).  Appellants also note that, even if the military wished to recall medical retirees, government regulations instruct that medical retirees "generally should be deployed to civilian defense jobs upon mobilization," and not to active-duty service.  Management of Regular and Reserve Retired Military Members, Dep't of Defense Instruction 1352.01, ¶ 3.2(g)(2) (Dec. 8, 2016).

We are sympathetic to Appellants' policy arguments.  But, as we have explained, our sole task is to determine whether Congress may constitutionally subject medical retirees to court-martial jurisdiction—and not to determine whether Congress's decision to do so is wise or fair.  The constitutional inquiry turns on whether medical retirees are in "the land and naval Forces," U.S. Const. art. 1, § 8, cl. 14, or have "severed all relationship with the military and its institutions," *Toth*,

350 U.S. at 14; it does not ask us to analyze the likelihood of an officer's recall.[10]

Further, the same regulations Appellants cite in support of their position also instruct that disabled retirees may be placed in a military role if "they have critical skills or volunteer for specific military jobs." Management of Regular and Reserve Retired Military Members, Dep't of Defense Instruction 1352.01, ¶ 3.2(g)(2) (Dec. 8, 2016). And, as Appellants concede, those regulations also allow the Army to "order *any* retired regular member" to perform whatever duties are "deemed necessary in the interests of national defense." *Id.* ¶ 3.3(b)(2) (emphasis added).

## III.

Because Wilson and Dillon hold "military status," *Solorio*, 483 U.S. at 439, and have not "severed all relationship with the military and its institutions" through separation, *Toth*, 350 U.S. at 14, they are part of "the land and naval Forces," U.S. Const. art. I, § 8, cl. 14. Accordingly, the statutory grant of military jurisdiction over them is constitutional. We therefore AFFIRM the district court's denial of Wilson's and Dillon's habeas petitions.

---

[10] Even if the likelihood of recall informed the constitutional analysis, we disagree with Appellants that the prospect of recalling retirees is "entirely illusory." Aplt. Br. at 44 (Wilson); Aplt. Br. at 49 (Dillon). "[I]n both of our wars with Iraq, retired personnel of all services were actually recalled." *United States v. Dinger*, 76 M.J. 552, 557 (N-M. Ct. Crim. App. 2017) (quotation omitted), *aff'd*, 77 M.J. 447 (C.A.A.F. 2018). And, when necessary, the armed forces have "occasionally recalled even permanently disabled military retirees to active duty." *United States v. Reynolds*, 2017 WL 1506062, at *4 (N-M. Ct. Crim. App. Apr. 27, 2017); *see Akol v. United States*, 167 Ct. Cl. 99, 102–03 (1964) (discussing the recall of a medically retired servicemember to "active duty ashore" in December 1941).